LESLIE H. BEN-ZVI, ESQ. (LB-8639)
*Attorney for Plaintiff*
1790 Broadway – 10th Floor
New York, NY 10019
(212) 719-5300 / 666-6656
Leslie@BenZviLaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

JFP TOURING, LLC,                                          **AFFIDAVIT**

                             Plaintiff,                    Docket No. 07-3341 (CM)(RLE)

          -against -

POLK THEATRE, INC.,

                             Defendant.

-------------------------------------------------------------x

**JEFFREY FINN**, being duly sworn, deposes and says:

1.     I am the President of Plaintiff JFP TOURING, LLC, am fully familiar with the facts

and circumstances of this matter and hereby submit this Affidavit in opposition to Defendant's

motion to dismiss or to change venue from New York City to Tampa, Florida.

### PRELIMINARY STATEMENT

2.     Plaintiff is a theatrical producer and owns the rights to produce the play *On Golden

Pond*. Defendant is a theatre located in Lakeland, Florida. Plaintiff (through its agent, Avid Touring

Group, Ltd.) and Defendant entered into an agreement by which Plaintiff would produce and

Defendant would present *On Golden Pond* at Defendant's theatre in Lakeland, Florida.

3.     Plaintiff presents a meritorious case herein that should be fully adjudicated before this

Court. Plaintiff and Defendant negotiated at great length the terms of an agreement by which

Plaintiff would present two performances of its touring production of *On Golden Pond* starring Tom

Bosley and Michael Learned at Defendant's theatre in Lakeland Florida on February 28, 2007. The parties executed two written agreements, two attached Schedules and a Technical Rider. Their extensive negotiations and correspondence are preserved in drafts, letters and emails. Defendant expressly relied upon the agreements, schedules, riders, letters and emails in planning the entire *On Golden Pond* Tour across the United States and turned down other locations based upon its belief that Defendant would pay for and present said February 28, 2007 shows.

4.    As more fully set forth below, Defendant defrauded Plaintiff and unilaterally breached the parties' agreement at the eleventh hour by not paying Plaintiff the monies due under the contract and by refusing to present *On Golden Pond.*

5.    After settlement talks failed, Plaintiff commenced an action in New York Supreme Court for breach of contract and fraudulent misrepresentation. Defendant removed the matter to United States District Court, Southern District of New York, and thereafter filed the instant motion to change venue to Tampa, Florida or, in the alternative, to dismiss the action.

6.    With respect to venue, the parties' written agreements expressly state that New York law shall apply herein and that, in the event of any controversies, venue would be in New York.

7.    Moreover, (i) Defendant was well-aware of Plaintiff's New York presence, (ii) *Plaintiff's* performance of the agreements took place in New York, (iii) Plaintiff, it's agent and its staff and crew are all located in New York, (iv) Plaintiff's bank, to which Defendant was to wire funds, is in New York and (v) Plaintiff, at Defendant's express request and as Defendant's agent, re-negotiated a union contract with a New York union so that Defendant could save money by using a non-union crew.

2

## FACTUAL STATEMENT

8.      Between approximately mid-August 2006 and September 18, 2006, Plaintiff and Defendant negotiated the terms of an agreement by which Plaintiff would produce and Defendant would present *On Golden Pond* at Defendant's theatre in Lakeland, Florida.

9.      On or about September 18, 2006, following approximately one month of negotiations as to the terms and conditions of said engagement, Plaintiff and Defendant reached a meeting of the minds whereupon Plaintiff sent Defendant the first of two written Agreements which jointly and severally codified the numerous terms and conditions negotiated by Plaintiff and Defendant.  This first agreement was signed by Defendant on or about October 27, 2006 (hereafter, "October 27th Agreement") (Exhibit A)

10.     The October 27th Agreement expressly set forth, *inter alia*, the following terms and conditions that had been negotiated by the parties:

| | | | |
|---|---|---|---|
| A. | Presenter: | | Defendant would be the presenter of *On Golden Pond* |
| B. | Venue | | The venue at which *On Golden Pond* would be presented would be the Polk Theatre in Lakeland. Florida |
| C. | Load-In | | The load-in would take place on Wednesday, February 28, 2007 |
| D. | Engagement Period | | Two performances of *On Golden Pond* would take place on Wednesday, February 28, 2007 |
| E. | Performance Schedule | | *On Golden Pond* would be performed at 3:00 pm and 8:00 pm. on Wednesday, February 28, 2007. |
| F. | Engagement Terms | (i) | Defendant would pay Plaintiff (i) the sum of $45,000.00, (ii) Ten (10%) Percent of the Net adjusted Gross Box Office Receipts for the two performances and (iii) Sixty (60%) Percent of the Net Adjusted Gross Box Office Receipts for the two performances. |
| | | (ii) | A deposit in the amount of $22,500.00 would be paid to Plaintiff by Defendant on or before January 29, 2007 by wire transfer and would be deemed to be an advance against the aforementioned $45,000.00 |

3

(iii)    The balance of $22,500.00 would be paid at 3:00 pm on February 28, 2007, *i.e.*, prior to the opening curtain of the matinee performance of *On Golden Pond* on February 28, 2007.

(iv)    The aforementioned payment of Ten (10%) Percent of the Net adjusted Gross Box Office Receipts for the two performances would be paid at the intermission of the evening performance of *On Golden Pond* on February 28, 2007.

(v)    The aforementioned payment of Sixty (60%) Percent of the Net Adjusted Gross Box Office Receipts for the two performances would be paid at the intermission of the evening performance of *On Golden Pond* on February 28, 2007 performances.

G.    Bank Information    The aforementioned wire transfers to be issued to Plaintiff by Defendant were to be sent to Plaintiff's bank, JPMorgan Chase Bank, Ground Floor, 1 Chase Manhattan Plaza, New York, NY 10081 and were to be directed to Plaintiff's account number # 1512-0848-1065

H.    Expenses    The parties incorporated by reference the following approved expenses as set forth on Schedule A to the Agreement:

| | |
|---|---|
| Stagehands/Technical Services | $7000.00 |
| Utilities | $150.00 |
| Playbill Printing | $1000.00 |
| Cleaning | $150.00 |
| General Expenses/Theatre Rental | $1200.00 |
| Hospitality | $500.00 |
| Hotel | $300.00 |
| House Manager | $264.00 |
| Advertising | $2000.00 |
| | **$12,564.00** |

I.    Star Requirements:    The parties agreed that per the Technical Requirements Rider, all star requirements would be a Defendant Expense.

Defendant would provide two (2) one-bedroom suites (one suite for each star) in a First Class deluxe accommodation for the duration of the stay during the Engagement. Each suite was to have a separate sleeping room from the parlor and all accommodations were to be approved by the company manager.

Defendant would provide two (2) private star dressing rooms, both of which would contain a full bathroom, refrigerator, cot/sofa, fully lighted mirrors, chairs, coffee and tea service, sodas, and non-carbonated bottled water on ice as outlined in the Technical Requirements Rider. A fruit plate was to be provided on the *Opening Night performance*. If there was a private shared lounge between the two star dressing rooms, then all hospitality items could be placed in the lounge to be shared by the stars.

Defendant would provide limousine or *Town Car transportation* to and from airport, to the hotel, to and from hotel to theatre, and to and from all press events as outlined in Technical Requirements Rider.

4

J.   Advertising Copy:   Not to exceed 15% on approved electronic, print, and outdoor advertising only. No commission on production or trade.

K.   Program Copy:   The cost of printing the Company's 9.5-pages of program copy will be included in the local fixed expenses.

L.   Ticket Prices:   The parties incorporated by reference, the ticket prices set forth on Schedule B to the Agreement. The parties agree as follows: The Box Office manifest would reflect all seats in the theatre; no seats would be held off the manifest, so-called "'Corporate seats" and "Donor seats" etc., must appear on the Box Office manifest and be included in the calculation of gross box office receipts at full-value of the applicable seating tier. Defendant informed Plaintiff that there were One Hundred (100) kills/obstructed view seats, which would not be utilized, and that patron (paid or comp) would be seated in said seats. The parties further agreed that the date on which tickets would go on sale to the public was yet to be determined.

M.   Discounts:   The parties incorporated by reference the following discounts as indicated on Schedule B to the Agreement.  Notably, Defendant made handwritten, *initialed changes upon the Agreement before returning it to Plaintiff.*

| | | |
|---|---|---|
| Section 1 | 690 seats @ $38.00 for a total of | $26,220.00 |
| *Section 2* | *262 seats @ $27.00 for a total of* | *$7,074.00* |
| *Section 3* | *352 seats @ $20.00 for a total of* | *$7,040.00* |
| | | |
| Gross Potential: | | $80,668.00 |

N.   Deductions:   *The parties incorporate by reference Schedule B for approved deductions and agreed as follows:* not more than one (1) type of percentage sales commission would be charged on any one (1) ticket and sales commissions would be calculated on ticket prices net of restoration charges and taxes, if any.

For purposes of Group Commissions, the parties agreed that a group would be defined as a minimum of ten (10) tickets at one performance, which were purchased by a single customer and that there would be no "bundling" of tickets from various performances or different buyers in determining a group minimum.

O.   Complimentary, Press Trade, or House Tickets:   There would be no complimentary or trade tickets of any kind without the prior written approval of Plaintiff or Plaintiff's representative.

The parties would each receive four (4) complimentary tickets for Opening Night and two (2) complimentary tickets for all other performances. Plaintiff must approve any additional complimentary tickets in writing in advance.

5

| P. | Company House Seats: | Plaintiff required Twenty (20) house seats per performance for purchase in the center Orchestra Section Premium Seats under 48 hour hold, to be sold at regular box office prices. |
|---|---|---|

Q.    Advertising Budget:    The weekly advertising budget would be as indicated on Schedule A unless otherwise approved in writing by Plaintiff of Plaintiff's national press representative. All other marketing expenses would be subject to the prior written approval of Plaintiff or Plaintiff's national press representative. Only those advertising and promotional materials furnished by Plaintiff could be used for the Engagement; any proposed changes would be subject to the prior written approval of Plaintiff or Plaintiff's national press representative.

R.    Marketing:    The advance sale timeline and preliminary marketing campaign had to be submitted to Plaintiff' representative within 30 days of public or private announcement. The advertising budget and marketing plan had to be submitted within 30 days of the on-sale and are subject to the prior written approval of Plaintiff's national press representative.

Excepting Defendant's season brochure which would be sent only to previous series subscribers, Defendant agreed not to advertise the Engagement until after December 10, 2006.

Defendant would submit its marketing plans and advertising budget to Plaintiff's national press representative, Anita Dloniak, tel: (216) 398-J931, fax: (216) 661-4645 and e-mail: anitad@stratos.net.

S.    Technical Rider:    Attached to the Agreement was the preliminary Technical Rider as of August 9, 2006, which was subject to change due to local conditions. Defendant expressly agreed to the terms of said attached Technical Rider.

*Any Additional Costs due to local conditions would be a Fixed Engagement Expense.*

Box Office Reports were to be faxed on a daily basis beginning on December 28, 2006 through the two performances on February 28, 2007 to Jeffrey Finn, the Principal of Plaintiff, to Plaintiff's fax number in New York: (212) 575-2434. All questions were to be directed to Jeffrey Finn in New York at (212) 575-9600.

The Crew and Staff for the production of *On Golden Pond* were all located in New York as follows:

General Manager: Jeffrey Finn, Jeffrey Finn Productions
Company Manager: Betsy Conner, Jeffrey Finn Productions
Booking Agent: Avid Touring Group Ltd.
Technical Supervisor: Peter Fulbright, Tech Production Services, Inc.
Production Stage Manager: Bernita Robinson
Head Sound: Sunil Rajan
Head Props: David Krugh
Wardrobe Supervisor: Kathy Guida

6

| T. | Special Provisions: | The form and manner of billing credits and sponsors on tickets would be determined by Plaintiff and Defendant would promptly and fully comply with said determination. Ticket stock would be printed as follows: "Show Sponsor Name TBA Presents ON GOLDEN POND". |
| | | Plaintiff would have the right to purchase seats for the tour sponsor at regular box office prices. |
| | | There would be no commission charged for any group booked by or on behalf of a company member through the company. |
| U. | Repeat Engagements: | Nothing in the agreement would obligate Plaintiff to afford subsequent presentation rights to Defendant. |
| V. | Booking Agent: | It was expressly agreed that Avid Touring Group, Ltd. was authorized to act as Plaintiff's designee on Plaintiff's behalf, but that Avid Touring Group, Ltd. was not a producer or presenter of the Production or a party to the Agreement and that Avid Touring Group, Ltd. was not be held responsible by Defendant for any of Plaintiff's obligations under the Agreement, or by Plaintiff for any of Defendant's obligations under the Agreement. |
| W. | Prevailing Terms: | In the event the Agreement, Schedules and/or Technical Rider conflicted with any terms contained in any of Defendant's riders and/or addenda, the terms of the Agreement, Schedules and/or Technical Rider would prevail over Defendant's riders and/or addenda. |

11.    On October 19, 2006, prior to the execution of the October 27th Agreement, Plaintiff sent Defendant an email which inquired whether Defendant, who had not yet signed the October 27th Agreement, was "bailing on this engagement."   Defendant responded as follows:

Absolutely not . . . Maybe you should know that we have an excellent reputation never cancelling shows...EVER!!!  You would not know that as we haven't worked together before.  You will never have to lose confidence with us as a client.

(Exhibit B)

12.    By October 24, 2006, Defendant advised Plaintiff that it (i) had already printed a brochure for its season ticket holders that included a listing for *On Golden Pond* plus (ii) had already begun to sell single tickets for *On Golden Pond.*  (Exhibit C)

7

13.    On or about October 27, 2006, Plaintiff, by its Executive Director, Leslie A. Sikora, made handwritten changes to the 'Company House Seats' section and to Schedule B and signed the Agreement at the end thereof under the words: "ACCEPTED AND AGREED." (Exhibit A)

14.    Following Defendant's execution of the October 27th Agreement, the following took place:

(i)    Plaintiff planned other aspects of the *On Golden Pond* Tour including, but not limited to, the routing of other performance dates around the February 28, 2007 performances at Defendant's theatre;

(ii)    Plaintiff neither sought nor accepted other *On Golden Pond* bookings for February 28, 2007;

(iii)    *On Golden Pond* bookings that were geographically inconsistent with the February 28, 2007 performances at Defendant's theatre were neither sought not accepted;

(iv)    Plaintiff incurred such unrecoupable expenses such as hotel reservations and site surveys.

15.    On or about December 7, 2006, Plaintiff sent Defendant four copies of a second agreement. The terms of this second agreement did not modify any of the terms of the October 27th Agreement and simply added such additional boilerplate language as the following: (i) box office income reconciliation, (ii) Defendant's obligations regarding theatre operation, (iii) promotion and advertising, (iv) insurance, (v) New York law and venue. This second agreement was signed by Defendant on or about January 9, 2007 (hereafter, "January 9th Agreement") (Exhibit D)

16.    Paragraph 15 of the January 9th Agreement, entitled *Resolution of Disputes*, expressly provides as follows:

> This Agreement and the performance thereof shall be construed in accordance with the law of the State of New York applicable to contracts fully performed therein. Any controversy or claim arising out of, or relating to this Agreement, or any alleged breach thereof, shall be settled by binding arbitration before a single arbitrator in New York, New York, in accordance with the Rules of the American Arbitration

8

Association, and judgment upon the award rendered by the Arbitrator may be entered in the highest court of the forum, state or federal, having jurisdiction thereof. <u>Each of the parties hereby consents and submits to the jurisdiction of the State and Federal courts located in the County of New York and consents to the venue thereof,</u> and consents to service of process by registered or certified mail at the address to which notices are to be given and agrees that such service shall be deemed effective as if personal service had been made within New York State, New York County. (Emphasis added)[1]

(Exhibit D)

17.     Between December 7, 2006 and January 9, 2007, Plaintiff and Defendant emailed with each other repeatedly regarding, *inter alia*, Defendant's desire to use a non-union crew to minimize costs.  (Exhibit E)

18.     On January 9, 2007, Defendant executed four (4) copies of the January 9th Agreement as well as the following cover letter to Plaintiff in New York:

Enclosed please find four (4) executed copies of the Agreement for *On Golden Pond* appearing at our Theatre February 28, 2007 for two shows. Alterations regarding the union section of the contract have been made following discussions between Ron Gubin and myself *that non-union crew would be acceptable. Should you require any additional information regarding this adjustment or the Agreement in general please call me at (863) 682-7553.*

We look forward to a great show(s) and working with AVID.

(Exhibit F)

19.     On January 12, 2007, Defendant asked Plaintiff to (i) forward information to Defendant to be printed in the February 28, 2007 programs and (ii) to send Defendant three movie-size posters of *On Golden Pond* so that Defendant, which occupies a movie palace, could display the same in conjunction with the February 28, 2007 production of *On Golden Pond*. (Exhibit G)

---

[1]     Although said paragraph 15 contains certain Arbitration language, neither Plaintiff nor Defendant has invoked said clause and has elected instead to proceed in Federal Court.

20.     On January 19, 2007,  Defendant wrote to Plaintiff regarding the January 9th Agreement as follows:

> As far as I know <u>they were mailed after Ron and I worked things out</u>. I make folders for all our events and <u>I have a copy of the contract</u> in there. As far as I knew <u>the rest had been FedExed</u>. Let me do some searching and I'll get back to you this afternoon. <u>Our part of the FedEx receipt is in my folder as well</u>. I will do a search on that and see what happened. We have been doing some construction and phone updates in the office so lots of things are out of sorts, but I can't imagine would be the problem.
>
> Sorry for the inconvenience- I'll let you know today.
>
> Leslie
>
> (Exhibit H)

21.     On or about January 19, 2007, Defendant sent Plaintiff another copy of the aforementioned January 9, 2007 cover letter accompanying the 'four (4) executed copies of the Agreement for *On Golden Pond.*" (Exhibit F)

22.     On January 26, 2007, at Plaintiff's own expense, Plaintiff conducted a site survey of Defendant's theatre with the full cooperation and approval of Defendant in preparation for the load-in and performances scheduled to take place on February 28, 2007.

23.     On January 28, 2007, Defendant failed to pay Plaintiff the sum of $22,500.00, as required under per the agreements..

24.     By various phonecalls and by e-mail dated February 2, 2007, Defendant thereafter notified Plaintiff that (i) Defendant, despite having signed both the October 27th and January 9th Agreements, would not be paying Plaintiff any sums due under the Agreement and that (ii) Defendant would not be presenting *On Golden Pond* as agreed on February 28, 2007. (Exhibit I)

### Affidavit of Defendant's Executive Director

25.     I have reviewed the April 26, 2007 Affidavit of Defendant's Executive Director, Leslie Sikora, and have the following response.

10

26.    The fact that Ms. Sikora devoted roughly half of her Affidavit to the history of the Polk Theatre and its status as a small, not for profit theatre is irrelevant to the issues before this Court.  Numerous, small not for profit theatres throughout the country honor their contractual commitments to present plays such as *On Golden Pond*.  Such theatres are precisely the venues to which small road companies bring professional theatre productions to audiences around the country.  Moreover, such theatres do not engage in fraudulent misrepresentation.

27.    Ms. Sikora is the individual who conducted extensive telephone, written and email communications with Plaintiff in New York.  For her to file a sworn statement that she did not know that Plaintiff, its agents and the staff and crew were all located in New York is an absolute falsehood.

28.    Ms. Sikora admits that she sought out Plaintiff on the internet.  Plaintiff's website clearly indicates that it is based in New York, that it has New York phone and fax numbers and that it has a New York address.  (Exhibit J)

29.    Ms. Sikora also admits that she dealt with Plaintiff's agent, Avid Touring, whose website also clearly indicates that it is based in New York, that it has New York phone and fax numbers and that it has a New York address.  (Exhibit K)

30.    Ms. Sikora's numerous emails reference numerous phonecalls and faxes between New York and her offices in Lakeland, Florida.  An examination of Defendant's telephone bills, which will certainly be a subject of discovery herein, will no doubt substantiate said phonecalls and facsimile transmissions.

31.    Moreover, as the Technical Rider, which was affixed to the October 27th Agreement, indicates, Defendant's staff and crew were primarily located in New York and clearly had metropolitan New York area codes such as "212," "646, " "917" and "914." (Exhibit A)

11

32.     In addition to the above misrepresentations, Ms. Sikora has been caught in yet another lie and must be held accountable therefor.  Although she undeniably represented on four (4) separate occasions on three (3) different dates (January 9th, 19th and 22nd) that the January 9th Agreement was in fact signed, now she falsely claims not to have signed it.  This is perjury.  Moreover, if she fails to produce copies of her version of the signed January 9th Agreement – which she admitted to keeping  in her office file  –  she will be held accountable for the willful destruction of material evidence.

33.     On January 9, 2007, Leslie Sikora signed the following cover letter to Plaintiff:

> Enclosed please find four (4) executed copies of the Agreement for *On Golden Pond* appearing at our Theatre February 28, 2007 for two shows. Alterations regarding the union section of the contract have been made following discussions between Ron Gubin and myself that non-union crew would be acceptable. Should you require any additional information regarding this adjustment or the Agreement in general please call me at (863) 682-7553.

> We look forward to a great show(s) and working with AVID.

> (Exhibit F)

34.     Three days later, on January 12, 2007, Leslie Sikora asked Plaintiff to (i) forward information to Defendant to be printed in the February 28, 2007 programs and (ii) to send Defendant three movie-size posters of *On Golden Pond* so that Defendant, which occupies a movie palace, could display the same in conjunction with the February 28, 2007 production of *On Golden Pond*. This action is clearly consistent with her execution of the January 9th Agreement.  Moreover, it constitutes material evidence in support of not only Plaintiff's breach of contract claim, but in support of Plaintiff's fraud claim. (Exhibit G)

35.     Ten days later, on January 19, 2007, Leslie Sikora wrote to Plaintiff and expressly confirmed the execution and mailing of the January 9th Agreement as follows:

As far as I know they were mailed after Ron and I worked things out. I make folders for all our events and I have a copy of the contract in there. As far as I knew the rest had been FedExed. Let me do some searching and I'll get back to you this afternoon. Our part of the FedEx receipt is in my folder as well. I will do a search on that and see what happened. We have been doing some construction and phone updates in the office so lots of things are out of sorts, but I can't imagine would be the problem.

Sorry for the inconvenience- I'll let you know today.

Leslie

(Exhibit H)

This constitutes material evidence in support of Plaintiff's breach of contract and fraud claims.

36.    On that same day, January 19, 2007, Leslie Sikora sent Plaintiff another copy of the aforementioned January 9, 2007 cover letter accompanying the 'four (4) executed copies of the Agreement for *On Golden Pond.*" Once again, this constitutes material evidence in support of Plaintiff's breach of contract and fraud claims. (Exhibit F)

37.    Once again, the relevance of Paragraph 15 of the January 9th Agreement, entitled *Resolution of Disputes,* is it's express reference to New York law and venue:

> This Agreement and the performance thereof shall be construed in accordance with the law of the State of New York applicable to contracts fully performed therein. Any controversy or claim arising out of, or relating to this Agreement, or any alleged breach thereof, shall be settled by binding arbitration before a single arbitrator in New York, New York, in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator may be entered in the highest court of the forum, state or federal, having jurisdiction thereof. Each of the parties hereby consents and submits to the jurisdiction of the State and Federal courts located in the County of New York and consents to the venue thereof, and consents to service of process by registered or certified mail at the address to which notices are to be given and agrees that such service shall be deemed effective as if personal service had been made within New York State, New York County. (Emphasis added) (Exhibit D)

38.    Twelve days later, on January 22, 2007, Defendant sent Plaintiff an email that the four copies of the January 9th Agreement had allegedly been lost, had just been located and were being sent to Plaintiff via Federal Express for delivery on January 23, 2007. Once again, Ms. Sikora

confirms that she signed and FedEx'd the January 9th Agreement and once again, this represents evidence of both the breach of contract and fraud claims. (Exhibit L)

39.     Sixteen days later, on January 26, 2007, Leslie Sikora, knowing that the January 9th Agreement had been signed and mailed, encouraged and permitted Plaintiff, at Plaintiff's own expense, to conduct a site survey of Defendant's theatre in preparation for the load-in and performances scheduled to take place on February 28, 2007. More evidence of a breach of contract and fraudulent misrepresentation on the part of Defendant.

40.     On January 28, 2007, Defendant failed to pay Plaintiff the sum of $22,500.00, as required under the agreements..

41.     By various phonecalls and by e-mail dated February 2, 2007, Defendant thereafter notified Plaintiff that (i) Defendant, despite having signed and mailed both the October 27th and January 9th Agreements, would not be paying Plaintiff any sums due under the Agreement and that (ii) Defendant would not be presenting *On Golden Pond* on February 28, 2007, as agreed. (Exhibit I)

42.     Despite Defendant's actions, however, Defendant has continued to advertise *On Golden Pond* on its website. Annexed hereto as Exhibit N is a copy of Defendant's June 5, 2007 website. (Exhibit M)

### The Agreements Contemplate Performance in New York

43.     Although *On Golden Pond* was to be performed on a single day, February 28, 2007, in Lakeland, Florida, Plaintiff's obligations under the terms of the (i) October 27th Agreement, Schedules A and B thereto and the Technical Rider attached thereto and (ii) the January 9th Agreement were almost entirely to be performed in New York City.

14

44. Simply put, Plaintiff was contractually obligated to deliver a New York Broadway "bus and truck" production of *On Golden Pond.*

45. As the numerous emails and referenced phonecalls between the parties indicate, between September 2006 and February 2007:

> (i) all technical and other issues to be worked out – and there were many, as the emails and phonecalls indicate – were directed to the Crew and Staff for the production of *On Golden Pond*, all of whom were located in New York as follows:
>
>> General Manager: Jeffrey Finn, Jeffrey Finn Productions
>> Company Manager: Betsy Conner, Jeffrey Finn Productions
>> Booking Agent: Avid Touring Group Ltd.
>> Technical Supervisor: Peter Fulbright, Tech Production Services, Inc.
>> Production Stage Manager: Bernita Robinson
>> Head Sound: Sunil Rajan
>> Head Props: David Krugh
>> Wardrobe Supervisor: Kathy Guida
>
> (ii) daily box office reports were to be faxed to Plaintiff's New York fax number (212-575-2434) beginning on December 28, 2006, two months before the performance, and all inquiries regarding box office reports were to be directed to Plaintiff in New York at (212) 575-9600;
>
> (iii) $22,500.00 was to be wired to Plaintiff's bank account at JPMorgan Chase in New York on or before January 29, 2007;
>
> (iv) Defendant would have to comply with the union rules of three New York-based unions: Actors Equity, IATSE and ATPAM;
>
> (v) all advertising (content, marketing and budgeting) was to be approved in advance by and coordinated with Plaintiff's New York staff.

(Exhibit A)

46. All of the payroll plus all of the technical and other pre-show issues were dealt with in New York, not in Lakeland, Florida. From September 2006 to February 2007, in preparation of the eventual performances in Lakeland, the actors, sets, stage managers, drivers, technicians and other personnel associated with the performance of the Agreements were nowhere near Lakeland, Florida. They were either in New York or on tour.

15

47. The parties' correspondence also reveals that, because Defendant was used to presenting much smaller shows – comedians like Steven Wright or musical duos like the Smothers Brothers – Defendant needed a great deal of assistance from Plaintiffs, their staff, their crew and their unions here in New York. Hence, there is a great deal of correspondence as to the technical aspects of producing *On Golden Pond* at Defendant's theatre. Defendant and its technical director consulted on an unprecedented level with Plaintiff's New York staff and crew regarding the load-in and operation of the production.

### New York Unions

48. As a "bus and truck" tour that originated out of New York City and was derived directly from the Broadway production of the same name, this production of *On Golden Pond* is subject to the <u>ongoing</u> rules, regulations and supervision of the New York theatrical unions.

49. The production was designated by the three New York unions connected to the show – Actors Equity (actors), IATSE (crew) and ATPAM (press agents and company managers) – as having a New York "point of organization" or "point of origin." This means, in no uncertain terms, that although these unions may have offices around the United States, it is the New York offices that administer and oversee ongoing union compliance. Hence, all union contracts were filed in New York and all union issues were resolved through New York.

50. References to these New York unions are found in the playbills and all advertising used by Defendant as well as throughout the Agreements, Schedules and Riders.

51. Among Plaintiff's obligations were the obligations to present *On Golden Pond* in full compliance with these three New York unions. Contractually, these obligations also fell to Defendant.

16

52.    Defendant, as the correspondence undeniably reveals, had a major union issue, *i.e.*, after reviewing and signing the agreements, schedules and riders, Defendant sought to use a non-union crew during the load-in and load-out to cut down on costs. This necessitated a great deal of negotiation among Plaintiff, Defendant and IATSE, the New York union that represents Plaintiff's technical crew.

53.    Defendant expressly requested that Plaintiff negotiate on Defendant's behalf and as Defendant's agent-in-fact in New York with IATSE regarding the New York IATSE contract and to obtain permission for Defendant to use a local non-union crew as to Defendant's presentation only. Plaintiff successfully secured such a modification of the IATSE union contract by getting IATSE to agree to a non-union local crew that would work side by side with Plaintiff's union crew from New York.

54.    Since this union contract modification took place after the October 27th Agreement was executed, Defendant was already contractually obligated to present *On Golden Pond* and was, in effect, being helped out of a financial jam by Plaintiff beyond the call of duty.

### Plaintiff's Production of *On Golden Pond* Constitutes New York Property

55.    The subject matter of the agreements entered into between the parties is Plaintiff's New York production of *On Golden Pond*. The New York aspects of Plaintiff's production of *On Golden Pond* are many and various:

1.    The entire supporting cast was auditioned, hired and rehearsed in New York.

2.    The entire sound design was created and built in New York.

3.    The entire lighting design was created and built in New York.

4.    All costumes were designed, created, fitted and sewn in New York.

5.    The entire Broadway set was designed and built in New York.

17

6.    The designers (sounds, lights costumes and sets) are all New York based.

7.    All sound equipment originated from Masque Sound in New York.

8.    All lighting equipment originated from GSD Lighting in New York.

9.    All Technical Supervisors are New York based.

10.   Most of the technical crew hired by the New York technical advisors are New York based.

11.   The advertisements specifically requested and used by Defendant were the same original advertisements and designs created for the Broadway stage in New York by a New York ad agency.

12.   Plaintiff's trucking company, Clark Trucking, was from New York.

56.    Virtually every aspect of Plaintiff's production of *On Golden Pond* originated in New York and should be considered "New York" property. That is precisely what Defendant contracted for. The show itself began as a Broadway production that concluded its New York run and then continued as a 'bus and truck" tour. Hence, the entire set and all costumes and props were created in New York for the New York stage. What made this production attractive to Defendants as a money-maker was precisely the fact that it was the New York production, not a college tour, not a summer stock production, not a local amateur theatre club show.

57.    If Defendant didn't want this *bona fide* New York property, Defendant surely could have contracted with other, lesser productions. Yet because Defendant knowingly sought out Plaintiff on the internet and wanted this New York production, it is clear that the property is distinctly a "New York property." Accordingly, when Defendant entered into the agreements with Plaintiff, Defendant knew all too well that it was getting a New York Broadway production directly from New York.

18

**Meritorious Causes Of Action: Breach of Contract and Fraudulent Misrepresentation**

58.     Defendant's failure to pay Plaintiff the sums owed under the agreements and to present *On Golden Pond* on February 28, 2007 constitute a breach of contract.

59.     Defendant deliberately and repeatedly made the following misrepresentations to Plaintiff between mid August 2006 and early February 2007:

      1.     that Defendant was ready, willing and able to present *On Golden Pond* at the Polk Theatre in Lakeland, Florida on February 28, 2007,

      2.     that Defendant had already advertised *On Golden Pond*,

      3.     that Defendant had already printed tickets for *On Golden Pond* and had begun to sell them to the public,

      4.     that Defendant executed and FedEx'd the January 9th Agreement to Plaintiff on January 9, 2007,

      5.     Defendant twice confirmed on January 19, 2007 that Defendant executed and FedEx'd the January 9th Agreement to Plaintiff on January 9, 2007,

      6.     Defendant confirmed on January 22, 2007 that Defendant executed and FedEx'd the January 9th Agreement to Plaintiff on January 9, 2007,

      7.     that Defendant would pay Plaintiff as follows: (i) the sum of $45,000.00 on or before January 28, 2007, (ii) Ten (10%) Percent of the Net adjusted Gross Box Office Receipts for the two performances and (iii) Sixty (60%) Percent of the Net Adjusted Gross Box Office Receipts for the two performances.

60.     Defendant knew that said representations were false at the time they were made.

61.     Plaintiff believed and relied upon said representations to its detriment as follows: (i) Plaintiff planned other aspects of the *On Golden Pond* Tour around the February 28, 2007 performances at Defendant's theatre, (ii) other bookings for February 28, 2007 were neither sought not accepted, (iii) bookings which were geographically inconsistent with the performances at Defendant's theatre were neither sought not accepted, (iv) unrecoupable expenses such as hotel reservations and site surveys were incurred by Plaintiff.

## CONCLUSION

62.    It is undeniable that Plaintiff presents exceedingly tenable claims herein for breach of contract and fraud and that said claims should be presented to this Court for a full adjudication on the merits.

63.    Equally compelling are the reasons not to dismiss for lack of jurisdiction or to change venue from New York to Tampa:  Defendant's awareness of Plaintiff's New York presence; Defendant's use of Plaintiff to re-negotiate the IATSE union contract; Plaintiff's performance of the agreements in New York; the presence of Plaintiff, its' agent and its staff and crew in New York; and the express language in the January 9th Agreement that New York law and venue would apply.

**WHEREFORE**, it is respectfully requested that Defendant's motion be denied in its entirety and that Plaintiff be granted the costs, fees, disbursements and attorneys fees incurred herein.

JEFFREY FINN

Sworn to before me
on June 7, 2007

Notary

LESLIE H. BEN-ZVI
Notary Public New York State
No. 4831159
Qualified in New York County
Commission Expire 4/10/10

20