

Avid Touring Group, Ltd.
234 West 44th Street – Suite 902
New York, NY 10036
212-840-4393
212-840-4397 Fax

December 7, 2006

Leslie Sikora
Polk Theatre, Inc.
127 South Florida Avenue
Lakeland, FL 33801



Dear Leslie:

Enclosed please find four (4) copies for the proposed agreement covering the engagement of "ON GOLDEN POND" in Lakeland FL on February 28, 2007.

Please discuss any alterations to this contract, <u>prior</u> to marking the contract, with Ron Gubin. Please have all copies of the contract and attached technical rider signed and returned to me. I will then see to it that they are countersigned by the Producer and will return a copy to you for your files.

If you have any questions please feel free to give me a call.

Please note the following signature pages:

- Engagement Agreement, Page 17
- Schedule A, Page 1
- Schedule B, Page 1
- Technical Rider (dated 9/26/06), Page 10 (there is no signature line, but please initial to indicate your acceptance of the terms provided)

Please note – we will also need your Employer/Federal ID Number – please fill in the blank on the first page of the Engagement Agreement.

Best wishes for a successful engagement.

Sincerely,

*Jessica Francis*
Jessica Francis
Operations Manager

encl.

D

Boilerplate Version: 1.8 (6/19/06)
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND
February 28, 2007
Page 1

# ENGAGEMENT AGREEMENT
## for
# ON GOLDEN POND

c/o Avid Touring Group, Ltd.
234 W. 44th Street, Suite 902
Tel: (212) 840-4393   Fax: (212) 840-4397

AGREEMENT made as of the 30th day of October 2006 by and between JFP TOURING, LLC. (hereinafter referred to as "PRODUCER") and POLK THEATRE, INC. (hereinafter referred to as "PRESENTER") in connection with PRESENTER's presentation of PRODUCER's production of ON GOLDEN POND starring Tom Bosley and Michael Learned (hereinafter referred to as "PRODUCTION").

| | |
|---|---|
| VENUE: | Polk Theatre |
| CONTACT PERSON: | Leslie Sikora, Executive Director |
| ADDRESS: | 127 South Florida Avenue |
| CITY, STATE, ZIP | Lakeland, FL 33801 |
| PHONE & FAX: | Tel: (863) 682-7553   Fax: (863) 682-8227 |
| EMAIL: | LeslieSikora@polktheatre.org |

As used herein, "Theatre" and "Venue" shall both refer to such venue listed above.

| | |
|---|---|
| PRODUCER: | JFP TOURING, LLC. |
| RESPONSIBLE BOOKING AGENT: | Ron Gubin, Avid Touring Group, Ltd. |
| ADDRESS: | 234 W. 44th Street, Suite 902 |
| CITY, STATE, ZIP: | New York, NY 10036 |
| PHONE & FAX: | Tel: (212) 840-4393   Fax: (212) 840-4397 |
| E-MAIL: | Gubin@AvidTouring.com |
| Employer Identification #: | 20-5029854 |

| | |
|---|---|
| PRESENTER: | POLK THEATRE, INC. |
| CONTACT PERSON: | Leslie A. Sikora |
| ADDRESS: | 127 South Florida Avenue |
| CITY, STATE, ZIP | Lakeland, FL 33801 |
| PHONE & FAX: | Tel: (863) 682-7553   Fax: (863) 682-8227 |
| E-MAIL: | lesliesikora@polktheatre.org |
| Employer Identification #: | |

| | |
|---|---|
| PRESENTER's Marketing Contact: | Leslie Sikora, Executive Director |
| PHONE & FAX: | Tel: (863) 682-7553   Fax: (863) 682-8227 |
| EMAIL: | LeslieSikora@polktheatre.org |

| | |
|---|---|
| PRESENTER's Box Office Contact: | Mary Pope, Accounting |
| PHONE & FAX: | Tel: (863) 682-7553   Fax: (863) 682-8227 |
| EMAIL: | MaryPope@polktheatre.org |

| | |
|---|---|
| PRESENTER's Technical Contact: | Brian Macke, Technical Director |
| PHONE & FAX: | Tel: (863) 682-7553   Fax: (863) 682-8227 |
| EMAIL: | BrianMacke@polktheatre.org |

| | |
|---|---|
| PRESENTER's Concessionaire: | Julie Ashley, House Manager |
| PHONE & FAX: | Tel: (863) 682-7553   Fax: (863) 682-8227 |
| EMAIL: | JulieAshley@polktheatre.org |

Boilerplate Version: 1.8 (6/19/06)  
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND  
February 28, 2007  
Page 2

The parties agree as follows:

1. **THE ENGAGEMENT.**

PRESENTER hereby engages PRODUCER, and PRODUCER hereby agrees, to provide the PRODUCTION upon all of the terms and conditions hereinafter set forth (the "Engagement").

    A.    Date(s) of load-in:    **Wednesday, February 28, 2007**
           Date(s) of Engagement:  **Wednesday, February 28, 2007**

    B.    Number of Evening Performance(s)/Matinee Performance(s):  **Two (2) Performances**
**Wednesday Matinee at 3:00 PM**
**Wednesday Evening at 8:00 PM**

PRESENTER shall schedule all performances in accordance with the rules of the various unions having jurisdiction over the Venue and the PRODUCTION. The foregoing notwithstanding, however, in no event shall there be less than five (5) hours between curtain times. In the event that PRESENTER's performance schedules create any claim for extra payments to PRODUCER's personnel for take-in, performance, take-out or other scheduled performances within the theatre, PRESENTER shall be solely responsible for such payment, specifically including, but not limited to, claims made by any union(s) on behalf of employees represented by said union(s).

    C.    Public On-Sale Date of Single Tickets: To Be Determined

    D.    Theatre Total Capacity (inclusive of seats in the orchestra pit): 1,304

    E.    Ticket Price Scale and Gross Potential:
           See Schedule B attached hereto and made a part hereof for Ticket Price Scale.

Potential Gross Gross Weekly Box Office Receipts prior to adjustments pursuant to 3.5 below is Eighty Thousand Six Hundred Sixty Eight Thousand Dollars ($80,668.00).

2.     **PRODUCER OBLIGATIONS**

**THE PRODUCTION AND CONTROL OVER THE ENGAGEMENT; NO PARTNERSHIP OR JOINT UNDERTAKING.**

2.1    PRODUCER shall have sole and exclusive control over the production, presentation and performance of the Production and of the Engagement hereunder including, but not limited to, the details, means and methods of the performance of said Engagement and the performances of each participant therein, and the persons to be employed by PRODUCER in performing the provisions of the Engagement.

2.2    It is agreed that PRODUCER is entering into this Agreement as an independent contractor and not as an employee, and that PRODUCER shall have the exclusive control over the means and method employed in fulfilling its obligations hereunder in all respects and in all details. It is expressly understood that this is a license agreement, and does not constitute, nor shall it be construed as constituting, a partnership or joint venture between PRESENTER and PRODUCER, nor shall PRESENTER be deemed to be PRODUCER's agent for any purpose whatsoever. Neither party shall have the right to make representations on behalf of the other party or to obligate or bind the other party in any manner whatsoever. Nothing in this Agreement shall give or is intended to give any rights of any kind to third parties.

2.3    PRESENTER agrees that the PRODUCTION shall be presented without any pre-show or post-show activities or ceremonies and/or any other performer(s) or production(s) being presented therewith.

**PRODUCER'S UNDERTAKINGS: THE PRODUCTION.**

PRODUCER agrees that it shall furnish and pay for the following elements in connection with the presentation of the PRODUCTION at the Theatre hereunder.

2.4  PRODUCER agrees to furnish a first class touring company of the PRODUCTION, fully rehearsed and directed, with a first class physical production, and to present the PRODUCTION at the Theatre during the Engagement in accordance with the schedule of performances as described in Section 1.B. of this Engagement Agreement and as set forth on Schedule B attached hereto and made a part hereof.

    2.4.1  In the event that one or more of the members of the PRODUCTION cannot perform due to ill health, physical disability, or other circumstances, the PRODUCER will furnish a substitute.

    2.4.2  In the event that the Star does not perform, the PRODUCER hereby agrees to reduce the guaranteed weekly fee (see paragraph 3.1.1.a) payable to the PRODUCER by $1/8^{th}$ of Star's weekly salary (if any savings has been realized by PRODUCER), less any understudy salary increase as governed and required by Actors' Equity Association and any cost of understudy rehearsal that may be required to put on the understudy. The PRODUCER will allow the Gross Box Office Receipts to be adjusted by any actual documented refunds or exchanges that occur due to the absence of the Star. No additional box office fees or ticket exchange charges will be allowed as Box Office Deductions for exchanges or refunds made as a result of the absence of the Star.

2.5  All salaries, fees, and per diem expenses of PRODUCER's employees, including all members of the cast, stage managers, traveling stagehands, traveling wardrobe personnel, traveling hair and makeup personnel, company press agent and company manager, and all payroll taxes and union fringe benefits applicable thereto.

2.6  All compensation to the authors, owners of performing rights in the PRODUCTION, directors, designers, licensors and producers including, without limitation, fees, advances, royalties, and per diems.

2.7  PRODUCER's general and administrative expenses, including PRODUCER's legal and accounting fees, PRODUCER's office charge, PRODUCER's long distance telephone (excluding when included in Venue telephone charges), PRODUCER's photocopying and messenger charges, insurance premiums on PRODUCER's policies insuring PRODUCER's equipment and personnel and other operating costs of PRODUCER.

2.8  All hauling and transportation costs to move the PRODUCTION of PRODUCER's employees to the Theatre, for any required local transportation for PRODUCERs employees in the city, and from the city to the next engagement of the PRODUCTION, excluding parking for PRODUCTION trucks during load-in and load-out, (as per Technical Rider attached hereto and made a part hereof) and local transportation for press events arranged for by PRESENTER.

2.9  Except as specified in the Technical Rider, any and all scenery, draperies, props, automation equipment, lighting equipment, sound equipment, special effects equipment, costumes, wigs, and other physical production elements of the PRODUCTION.

2.10  There shall be no discrimination practiced by PRODUCER or its employees in the Theatre because of race, color, creed, sex, sexual orientation, or disability against any performer or patron as to admission to, or seating in, the Theatre or in connection with any element of the Engagement.

### 3. COMPENSATION TO PRODUCER.

  3.1  Producer's Share of Receipts.
As full compensation for the services of PRODUCER hereunder, PRESENTER will pay to PRODUCER in the name of JFP TOURING, LLC., in United States currency, by certified check, money order, wire transfer or accepted bank draft the following:

    3.1.1  The Guarantee.
    3.1.1.a  The sum of Forty Five Thousand Dollars ($45,000.00) (the "Fixed Guarantee") per two performance week; plus

    3.1.1.b  Ten percent (10%) of the Net Adjusted Gross Weekly Box Office Receipts (the "Percentage Payment") as

Boilerplate Version: 1.8 (6/19/06)
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND
February 28, 2007
Page 4

defined in paragraph 3.5; plus

    3.1.2    <u>Overage.</u>
Sixty percent (60%) of the Net Adjusted Gross Weekly Box Office Receipts exceeding the combined sum of: (i) the combined totals of the Fixed Guarantee and the Percentage Payment; and (ii) the Local Weekly Fixed Expenses and Documented and Substantiated Expenses (which may additionally include Variable Expenses) as set forth in Schedule A attached hereto and made a part hereof (the "Overage").

    3.2    <u>Payment Schedule</u>.
The foregoing payments shall be due and payable to and in the name of PRODUCER as follows:

    3.2.1a    **A deposit in the amount of Twenty Two Thousand Five Hundred Dollars ($22,500.00) shall be due and payable on or before Monday, January 29, 2007 by wire transfer (Bank Information listed below) and shall be deemed to be an advance against the Fixed Guarantee.**

    3.2.1b    The balance of the Fixed Guarantee shall be due and payable no later than 3:00 pm on the day of the initial performance hereunder by wire transfer. PRESENTER hereby guarantees to pay PRODUCER the Fixed Guarantee as and when due, irrespective of the actual gross box office receipts derived from performances of the Production at the Theatre hereunder, without any deduction, charge, set-off or other withholding of any kind. **The deposit shall apply against the Fixed Guarantee.**

    **SEND TO BANK INFORMATION**
| | |
|---|---|
| **ABA or Routing #:** | 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 |
| **Bank Name:** | JP Morgan Chase Bank |
| **Bank Country:** | USA |
| **Bank Address:** | Ground Floor, 1 Chase Manhattan Plaza, New York, NY 10081 |

    **SEND TO ACCOUNT INFORMATION**
| | |
|---|---|
| **Account #:** | 1512-0848-1065 |
| **Account Name:** | JFP Touring, LLC |
| **Account Holder's Address:** | 1501 Broadway, Suite 2003, New York, NY 10036 |
| **Currency (US $ or Other):** | USD |

    3.2.2    The Percentage Payment (Ten percent (10%) of the Net Adjusted Gross Weekly Box Office Receipts) shall be due and payable at intermission of the final performance.

    3.2.3    No later than intermission of each performance herein, PRESENTER shall provide to PRODUCER a box office statement for such performance signed by the box office treasurer and company manager or other representative of PRODUCER.

    3.2.4    Intentionally deleted.

    3.2.5    The Overage for the Engagement is cumulative and shall be due and payable to and in the name of PRODUCER during intermission of the final performance of the Engagement hereunder, accompanied by an itemized statement showing the computation thereof, certified by PRESENTER to be true and accurate. Final settlements shall be subject to PRODUCER's written approval.

    3.2.6    It is understood and agreed that all costs and expenses to be charged as Local Weekly Documented and Substantiated Expenses in determining the Overage payable to PRODUCER (other than costs and expenses based on a percentage of Net Adjusted Gross Weekly Box Office Receipts) shall be amortized and allocated pro-rata over the Engagement.

    3.3    <u>Settlement Documentation</u>.
~~**No later than one day prior to the last business day before the final performance of the Engagement,**~~ PRESENTER shall provide PRODUCER with documentation of labor, advertising and marketing expenses (as described in Paragraph 6.5) which PRESENTER intends for PRODUCER to consider as Local Weekly Documented and Substantiated Expenses in order to allow PRODUCER to review such documentation in time for any additional substantiation to be requested from third parties prior to the settlement of the Engagement.

Boilerplate Version: 1.8 (6/19/06)
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND
February 28, 2007
Page 5

PRESENTER shall provide PRODUCER with documentation of any other expenses which PRESENTER intends for PRODUCER to consider as Local Weekly Documented and Substantiated Expenses no later than **settlement**, at which time PRESENTER and PRODUCER shall determine the Overage due to PRODUCER (if any) and complete the settlement of the Engagement in accordance with the terms set forth in this agreement.

If at the time of settlement PRESENTER does not have final documented bills, PRESENTER will in good faith estimate the amount of said bills and preliminary settlement will be made on the basis thereof, and PRESENTER will immediately after procuring the documented receipted bills send a photostat copy thereof to PRODUCER. If the figures shown thereon are not the same as those used in making the settlement, the necessary adjustments will be made. The settlement on the basis of the figures furnished by PRESENTER shall not preclude PRODUCER from thereafter questioning the correctness of said figures or preclude PRODUCER from collecting any additional monies that may be due it on the basis of the correct figure. PRESENTER shall hold no monies in escrow, and Local Weekly Documented and Substantiated Expenses may not include any monies in escrow, whether against bad checks, bank charges, telephone charges, estimated expenses or otherwise.

3.4    Timeliness.
All payments shall be made as provided herein. If not so paid, PRODUCER shall have the right to cancel the balance of the current performance and any future performances. However, in the event of such cancellation PRESENTER shall not be relieved from any of its obligations under this Agreement, including, without limitation, its obligation to pay full compensation due PRODUCER as if the performance and future performances, if any, were presented in its, or their, entirety. In the event PRODUCER is not paid in full at the time provided herein, PRESENTER hereby authorizes the Theatre to pay any sums due, or to become due to, PRODUCER from PRESENTER, from funds in its possession from sales of tickets for the performance(s), notwithstanding the fact that such funds, or portions thereof, would otherwise be payable to PRESENTER. In such event PRESENTER hereby releases Theatre, and holds Theatre harmless, from any obligation to PRESENTER in connection with funds which Theatre has turned over to PRODUCER. PRESENTER shall pay all amusement, admission, value added or similar taxes, if any.

3.5    Definitions/Deductions/Surcharges.
3.5.1    Gross Gross Weekly Box Office Receipts shall mean all receipts received each performance week, including, without limitation, any taxes and surcharges included in the ticket price.
Before any commissions are taken, reduction of the Gross Gross Weekly Box Office Receipts by any documented taxes and surcharges shall result in Net Gross Weekly Box Office Receipts.
Reduction of the Net Gross Weekly Box Office Receipts by any fees or commissions (net of taxes and surcharges) with respect to subscription, theatre party, group, on and off premises box office, Internet, ticket agency and credit card sales shall result in Net Adjusted Gross Weekly Box Office Receipts.

By example:
GROSS GROSS WEEKLY BOX OFFICE RECEIPTS
- SURCHARGES
GROSS WEEKLY SALES

GROSS WEEKLY SALES
-TAXES
NET GROSS WEEKLY BOX OFFICE RECEIPTS

NET GROSS WEEKLY BOX OFFICE RECEIPTS
- FEES & COMMISSIONS
NET ADJUSTED GROSS WEEKLY BOX OFFICE RECEIPTS

Net Adjusted Gross Weekly Box Office Receipts shall be calculated in the following order: 1) First, any approved surcharges over and above the printed ticket price will be eliminated from the subsequent calculations, which will be based on the printed ticket price; 2) next, tax(es) actually collected and paid to governmental tax authorities shall be calculated on the printed ticket price, and shall be deducted from the printed ticket price; and 3) finally, any commissions approved as per Schedule B shall be based on the printed ticket price after deduction of taxes as aforesaid, and shall be deducted from same. It is agreed that not more than one (1) type of percentage sales commission may be charged on any one (1) ticket. Missing or unaccounted for or stolen tickets shall be deemed sold at full price. In no event shall any commissions, surcharges, or deductions be taken or paid on account of missing or unaccounted for or stolen tickets.

Boilerplate Version: 1.8 (6/19/06)
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND
February 28, 2007
Page 6

The foregoing notwithstanding, if a theatre restoration fee has been included in the printed ticket price, said theatre restoration fee shall be deducted from the printed ticket price and wherever the term "printed ticket price" in the foregoing paragraph appears, it shall be deemed to mean "printed ticket price minus theatre restoration fee." The purpose of this Paragraph 3.5.6 is to ensure that PRODUCER does not pay tax or commission on any surcharge or on any theatre restoration fee whether or not same is treated as a surcharge, and further to ensure that no commission is paid on any box office income collected as taxes.

    3.5.2    No surcharge of any kind, including, without limitation, any theatre restoration fee, shall be made or charged to ticket buyers, except as may be specifically approved in advance by PRODUCER in writing, and under no circumstances shall PRESENTER be permitted to charge and retain any surcharge above the printed ticket price.

    3.5.3    All fees and commissions on credit cards shall be at the exact rate specified on Schedule B. There shall be no commissions, fees or surcharges charged on complimentary tickets. There will be no discounts of any kind on ticket prices without the prior written approval of PRODUCER.

    3.5.4    PRESENTER shall not deduct any fees paid to any remote box office, credit card company, or broker which is affiliated with PRESENTER, except as specifically disclosed in Schedule B hereto, without PRODUCER's prior written consent. As used in this Agreement, a company is deemed to be "affiliated" with PRESENTER if any officers, directors, partners, or owners of a substantial financial interest in such company are officers, directors, partners or owners of a substantial financial interest in PRESENTER, or if any of PRESENTER's officers, directors, partners or owners of a substantial financial interest in PRESENTER are officers, directors, partners or owners of a substantial financial interest in such company, or if PRESENTER and such company are under common control.

3.6    Taxes/Assessments.
PRESENTER agrees to notify PRODUCER in writing within no later than sixty (60) days prior to the Engagement, of any State, County, Municipal or other taxes or assessments that may be levied upon or withheld from PRODUCER's fee, share of Net Adjusted Gross Weekly Box Office Receipts, payroll or employees' salaries. PRESENTER shall be liable for payment of any fines, penalties or assessments levied upon PRODUCER by reason of PRESENTER's breach of this paragraph. Any Federal or other admissions taxes shall be substantiated by copies of the applicable statute, remittance forms and check for remittance.

3.7    Subscription Allocation.
PRESENTER will provide substantiation of any allocation of receipts resulting from subscription sales to be included in the Gross Gross Weekly Box Office Receipts of the Engagement. Subscription tickets shall be calculated at the exact ticket prices as stated in Schedule B. PRESENTER will not discount subscription ticket prices for the Engagement without prior written approval by PRODUCER and then only in the amounts so approved.

3.8    League Dues and Assessment Fee
At the time of each weeks Engagement settlement, the PRODUCER's share of any dues payable to the League of American Theatres and Producers should be deemed a direct company charge and the PRESENTER's share of such dues should be deemed included in Local Weekly Fixed Expenses. At the time of weekly settlement the PRODUCER shall remit a check payable to the League in the amount of $0.047 per paid admission and the PRESENTER shall remit a separate check in the amount of $0.023 per paid admission. The PRESENTER is responsible for sending both checks and the attached remittance form (signed by both parties) to the League offices.

## 4. PRESENTER OBLIGATIONS.

PRESENTER additionally agrees, represents and warrants that it can and will duly fulfill and comply with the following requirements and conditions. Costs incurred as a result of compliance by PRESENTER with the following requirements and conditions shall be either a "Fixed" or a "Documented and Substantiated" engagement expense as set forth in Schedule A. Any engagement expense not specified in Schedule A as an approved "documented or substantiated" expense (including, without limitation, the cost of any local labor requirements that fall outside the requirements of the PRODUCTION as stipulated by PRODUCER) shall be deemed included within the approved "fixed" expense amount set forth in Schedule A attached hereto. "Fixed" expenses shall include all of PRESENTER's obligations and operating expenses to operate Theatre as a first-class theatre suitable in all respects and at all times during the Engagement for the presentation of the PRODUCTION at the Theatre. PRODUCER shall not be charged for, and the settlement of the Engagement may not include, any item other than those specified on the attached Schedule A without PRODUCER's prior written approval.

4.1    Theatre.

Boilerplate Version: 1.8 (6/19/06)
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND
February 28, 2007
Page 7

PRODUCER shall have the exclusive use of the Theatre from the time of load-in of the PRODUCTION through and including the time of load-out. PRESENTER will furnish for each performance of the PRODUCTION, and for daytime rehearsal prior to each performance if requested by PRODUCER, the Theatre, properly heated (winter) or air conditioned (summer), ventilated, lighted, clean, in good order, and staffed to the satisfaction of PRODUCER. Theatre shall be available to PRODUCER by 8:00 a.m. of the day prior to the day of the first performance unless otherwise agreed in writing by the parties. PRESENTER warrants and represents that PRESENTER is, or will be prior to the date(s) of the Engagement hereunder, the Venue landlord or manager of, or has, or will have, a valid lease upon the Theatre. Proof of the foregoing will be given to PRODUCER upon request. If PRESENTER does not own the Theatre or have a long-term lease, PRESENTER shall provide PRODUCER or have available for inspection a true and accurate copy of PRESENTER's lease agreement with the Theatre. In addition, PRESENTER shall provide PRODUCER with free and exclusive use of any and all marquees, houseboards, plastics, and other advertising space connected to or with the Theatre. PRODUCER shall not be liable or responsible to Venue's landlord or management for any costs or expenses related to or in connection with the use of Theatre by PRODUCER, except as otherwise provided herein.

During the Term, PRODUCER, its employees, representatives, and invitees shall have full rights of ingress and egress from the Theatre through all halls, corridors, lobbies, alleys or sidewalks in or appurtenant to the premises. No persons except as may be engaged by PRESENTER in connection with the operation of the Theatre, shall enter any stage areas or dressing rooms at any time, or within the audience areas during rehearsals or performances of the PRODUCTION, except for members of the audience holding tickets for admission, and except as required to furnish services as herein provided. PRESENTER shall furnish adequate security for the observance of the aforementioned restrictions.

4.2     Dressing Rooms.
PRESENTER will furnish comfortable, properly heated (winter) or air conditioned (summer), ventilated, clean and well-lighted dressing rooms as outlined in the attached Technical Requirements Rider near the stage equipped with make-up tables, mirrors, chairs, hot and cold running water, hanging facilities for costumes and toilet and lavatory facilities. PRESENTER shall further ensure that the dressing rooms and backstage area conform to Actors' Equity Association's Safe and Sanitary Code. PRESENTER will be liable to PRODUCER for any claim made by Actors' Equity Association or any other party of a violation of the Safe and Sanitary Code (which PRODUCER will provide to PRESENTER upon request).

4.3     Stage.
PRESENTER will ensure that all sets of lines in the Theatre shall be free and clear of all drapes, scenery, lighting equipment, motion picture screens, orchestra shells and "clouds" and the stage floor, back wall and wing areas shall be free and clear of all extraneous equipment and materials prior to the arrival of PRODUCER's personnel. PRESENTER shall further ensure that the stage and wing areas will be swept clean prior to the arrival of PRODUCER's personnel at the Theatre and that the stage and wing areas and any dance or other floor, false stage or stage covering installed by PRODUCER will be swept clean and mopped prior to each performance specified herein;

(See attached "Technical Requirements Rider")

4.4     Power.
PRESENTER will furnish adequate electrical power supply and lighting equipment as per the Technical Requirements Rider attached hereto and made a part hereof;

4.5     Access.
PRESENTER will ensure that all truck approaches (alleyways, driveways, lane ways) to the Theatre loading dock will be free and clear of all other vehicles, debris, snow and any and all extraneous materials permitting direct and undetained approach of PRODUCER's trucks, and that stage doors will be accessible and properly lighted. In the event of snow or ice on approach, PRESENTER agrees to have the approach salted, sanded, and/or shoveled clear prior to the trucks' scheduled arrival. PRESENTER will provide and pay for street parking permits necessary for parking trucks and closing streets during load-in and load-out, the cost of which will be included in Fixed Expenses;

4.6     Preliminary Theatre Costs.
PRESENTER will bear, as a Fixed Expense per Schedule A, all preliminary theatre costs, including, but not limited to, the local costs of any necessary advance trips; preparation of the stage, fly system, sound system, electrical system, orchestra pit, loading dock, auditorium and dressing rooms as are required to properly present a first class theatrical production. The costs of any additions and/or modifications to the Theatre which are made at the specific written request of the PRODUCER prior to the commencement of the load-in for the Engagement (e.g. spotting of lines) shall be allowable as an approved Documented Expense as

Boilerplate Version: 1.8 (6/19/06)
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND
February 28, 2007
Page 8

set forth in Schedule A.

4.7     Front-of-House.
PRESENTER will furnish and bear all costs of all salaries, payroll taxes and processing, and union fringe benefits for Theatre's general and administrative staff, ushers, ticket takers, house manager and assistant(s), all other house staff, stage doormen, switchboard operator(s), Theatre's technical director, building engineer, and house electrician not included in the PRODUCTION's yellow card requirements and the foregoing shall be included either as Fixed or Documented Expenses as set forth in Schedule A;

4.8     Operating Costs.
PRESENTER will furnish and bear all costs of salaries, payroll taxes and processing, union fringe benefits for all bookkeeping staff, housekeeping staff, police security and traffic control, Theatre's general and administrative costs, utilities and energy (including house lights and fixtures), infrared listening devices or any expenses incurred complying with ADA requirements, medical paramedic costs, cleaning and supplies, customary and required maintenance and repairs and any and all other costs of operating the Theatre and any and all other locally-incurred expenses related to the presentation of the PRODUCTION and the foregoing shall be included either as Fixed or Documented Expenses as set forth in Schedule A. Any costs to the Theatre underwritten by a sponsor will not be passed on to the PRODUCER;

4.9     Ticket Sales Costs.
PRESENTER will bear all costs of box office expenses including, but not limited to, supplies and tickets, ticket printing, salaries, payroll taxes and processing, and union fringe benefits for all sales personnel, including, without limitation, box office, subscription, group sales, direct mail, outlets, and remotes for advance sales, preliminary box office and run-of-show and the foregoing shall be included either as Fixed or Documented Expenses as set forth in Schedule A;

4.10    Musicians:
Intentionally deleted.

4.11    Local Stagehands, Wardrobe and Loaders:
As required by the attached Technical Requirements Rider, PRESENTER will furnish and bear all costs, as set forth in Schedule A, of salaries, payroll taxes, union fringe benefits, and expenses of all local labor, including, without limitation, stagehands, wardrobe, hair, make-up, and loaders (including local contractor or business agent) for all required calls, including, without limitation, the following:

Advance technical surveys and spotting calls;

Take-in and Take-out including all costs for teamsters and loaders for the PRODUCTION's trucks, union stagehands, installation of all set pieces, drapery, sound and electrical equipment, cleaning, any strip or restoration of theatre that may be required, as well as costs for any additional personnel having jurisdiction over the facility; and

Load-in rehearsals, sound check, work calls and show calls.

Please note that wardrobe and hair daywork does not include the continuity call prior to the start of each performance which is part of the show call.

PRESENTER hereby acknowledges that the load-in schedule may result in local labor overtime. Accordingly, PRODUCER and PRESENTER hereby agree that local labor overtime premiums and/or other costs (including, but not limited to, catering for the stage crew) which are incurred as a result of an overtime load-in, shall be considered Documented Expenses of the Engagement.

**(See attached "Technical Requirements Rider")**

4.12    Playbills.
PRESENTER will print, copy and distribute to each audience member free of charge a house program conforming exactly with the program copy furnished by PRODUCER in its entirety;

4.13    Advertising & Marketing.
PRESENTER will plan, budget and bear all costs of a comprehensive advertising and marketing campaign as set forth on Schedule A, submit it to PRODUCER for prior written approval and execute said campaign only as mutually approved by

Boilerplate Version: 1.8 (6/19/06)  
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND  
February 28, 2007  
Page 9

PRODUCER and PRESENTER. In addition, PRESENTER shall furnish and bear all costs of the local press agent, publicity and marketing staff, groups sales, direct mail, production and commissions for placement of print and electronic advertising, and subscription expenses not covered by PRESENTER's box office commission (See Paragraph 6);

4.14    Technical Requirements Rider.
PRESENTER will fulfill and comply with all of the requirements of the Technical Requirements Rider and will comply promptly with directions of PRODUCER regarding production requirements for the performances hereunder;

4.15    Star Requirements Rider
Per the Technical Requirements Rider, all star requirements shall be a **PRESENTER** Expense.

PRESENTER will provide two (2) one-bedroom suites (one suite for each star) in a First Class deluxe accommodation for the duration of the stay during the Engagement. The suites must have a separate sleeping room from the parlor and all accommodations are to be approved by the company manager.

PRESENTER shall provide two (2) private star dressing rooms, both of which shall contain a full bathroom, refrigerator, cot/sofa, fully lighted mirrors, chairs, coffee and tea service, sodas, and non-carbonated bottled water on ice as outlined in the Technical Requirements Rider. A fruit plate is to be provided on the Opening Night performance. If there is a private shared lounge between the two star dressing rooms, then all hospitality items may be placed in the lounge to be shared by the stars.

PRESENTER shall provide limousine or Town Car transportation to and from airport, to the hotel, to and from hotel to theatre, and to and from ALL press events as outlined in Technical Requirements Rider.

4.16    Local Requirements or Conditions.
PRODUCER's stage labor and musician requirements as specified in the Technical Requirements Rider are based on the minimum requirements to realize the PRODUCTION in an ideal facility. The cost of any additional stage labor that may be required by local union requirements or conditions shall fall within the approved Fixed Expenses in Schedule A attached hereto. In the event that PRESENTER fails to provide the required number of personnel for any element of the Engagement, PRESENTER agrees that PRODUCER may engage the balance of personnel required and PRESENTER will bear all such costs.

4.17    Union Compliance.
PRESENTER will comply with all regulations and requirements of any union or unions that may have jurisdiction over any of the materials, facilities (including Venue), and personnel to be furnished hereunder. Upon the signing of this Agreement, PRESENTER shall provide PRODUCER with copies of any union contracts that may or will affect the settlement in any way.

All personnel to be provided by PRESENTER shall be members in good standing of any union having jurisdiction and shall be subject to PRODUCER's direction during take-in and take-out, immediately before, during, and immediately after each performance hereunder. None of such personnel shall be deemed to be employees of PRODUCER, and PRODUCER shall not be responsible for payment of workers compensation, unemployment insurance, social security, withholding taxes or any other cost or liability in connection therewith.

4.18    Payroll Taxes and Benefits
The breakdown of payroll taxes and benefits must be submitted by PRESENTER to PRODUCER thirty (30) days in advance of the Engagement. Payroll taxes and benefits on the employees paid by PRESENTER for settlement purposes shall be those actually paid and documented. In no event shall PRESENTER include in payroll taxes and benefits any administrative surcharge paid in whole or in part to PRESENTER, directly or indirectly.

4.19    Insurance.
PRESENTER will provide insurance coverage as outlined in Paragraph 9 hereof.

4.20    Banking.
As is customary in the theatrical touring industry, PRESENTER hereby agrees to request and encourage a local bank within walking distance of the Venue to provide free check cashing to the PRODUCER's employees during the term of the Engagement for checks drawn on the PRODUCER's accounts. PRODUCER acknowledges that check-cashing procedures will be subject to the policies of the local bank.

Boilerplate Version: 1.8 (6/19/06)  
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND  
February 28, 2007  
Page 10

4.21    Performance Schedules.
PRESENTER will schedule all performances in accordance with the rules of the various unions having jurisdiction over the Engagement. In the event that PRESENTER's performance schedules create any claim for extra payments to the PRODUCTION's personnel for take-in, performance, take-out or other scheduled performances within the Theatre, PRESENTER shall be solely responsible for such payment, specifically including, but not limited to, claims made by any union(s) on behalf of employees of said union(s).

4.22    No Discrimination.
There shall be no discrimination practiced in the Theatre because of race, color, creed, sex, sexual orientation or disability against any performer or patron as to admission to, or seating in, the Theatre or in connection with any element of the Engagement.

4.23    In the event PRESENTER refuses or neglects to provide any of the items required to be provided by PRESENTER hereunder and/or fails to make any of the payments required to be made by PRESENTER hereunder, PRODUCER shall have the right, but not the obligation, in its sole discretion, either: (a) to not furnish the PRODUCTION until said requirements and conditions shall have been duly met, fulfilled and/or complied with; all without relieving PRESENTER of its obligation to pay all the monies it is required to pay had the PRODUCTION been presented as scheduled; or (b) to do what PRESENTER shall have failed to do, in which event PRESENTER shall reimburse PRODUCER for all costs and expenses directly or indirectly incurred by it by reason thereof. Payment therefor shall be made by PRESENTER promptly after the submission to it of a bill. PRODUCER shall have the right not to present the PRODUCTION until the said bill shall have been paid; all without relieving PRESENTER from its obligation to pay all monies it is required to pay had the PRODUCTION been presented as scheduled. Notwithstanding the exercise of such rights by PRODUCER, any amounts theretofore paid to PRODUCER by PRESENTER shall be retained by PRODUCER, and any sums due under the terms hereof shall immediately become payable to PRODUCER.

5.    **BOX OFFICE AND TICKET SALES; BOOKS AND RECORDS.**

5.1    Ticket Pricing.
No changes in the ticket price scale shall be made without PRODUCER's prior written approval. PRESENTER and PRODUCER further agree that there shall be no discounts from the ticket prices set forth in Schedule B unless specifically authorized in writing by PRODUCER in advance.

5.2    Ticketing.
PRESENTER agrees to submit to PRODUCER a seating diagram with actual numbered seats and location of all seats to be made available for sale. PRESENTER hereby warrants, represents, and guarantees that the capacity of the Theatre, the potential Gross Gross Weekly Box Office Receipts, the ticket prices, and the number of categories of tickets (if any) to be discounted shall be as set forth in Schedule B. PRESENTER agrees to sell only reserved seats for the performance(s) covered by this Agreement, the price of which shall be printed on numbered tickets for each performance to indicate the sections of the Theatre(s) and the categories of ticket prices. The location of each seat shall be printed on each ticket. (PRESENTER shall provide PRODUCER's representative with a manifest of the tickets printed certified by the ticket printer or certified by the computer printout record.) There shall be no free tickets nor any discount tickets except as specified above. No tickets for standing room shall be placed on sale for any performance until tickets for ninety percent (90%) of the capacity of the Theatre have been sold. PRESENTER's officers and employees shall have control of the sale of tickets in the box office but PRODUCER's representatives shall have access during regular box office hours to the box office. PRODUCER and/or PRODUCER's representative shall have the right to be present in the Theatre box office for each performance of the PRODUCTION. Promptly after the curtain time of each performance, PRESENTER's treasurer shall deliver a statement to PRODUCER's representative certifying all tickets sales for that performance.

Further, PRESENTER represents and warrants that the seating capacity of the Theatre and the ticket prices for performances of the PRODUCTION shall be as set forth in Schedule B, and that Schedule B includes every seat in the Theatre, including, without limitation, emergency, corporate and box seats. PRESENTER warrants and represents that there are no seats in the Theatre that do not appear on the box office manifest and on Schedule B. **PRESENTER has informed PRODUCER that there are One Hundred (100) kills/obstructed view seats, which will not be utilized, and no patron (paid or comp) will be seated in them (See Schedule B attached).** PRESENTER shall not order, sell, or authorize the sale of tickets to any performance of the PRODUCTION in a number greater than the lawful seating capacity of the Theatre as set forth in Schedule B.

Boilerplate Version: 1.8 (6/19/06)
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND
February 28, 2007
Page 11

The form and manner of billing credits and sponsors on tickets shall be determined by PRODUCER and PRESENTER shall promptly and fully comply with said determination. Ticket stock should be printed as follows: "<u>Show Sponsor Name TBD</u> Presents *ON GOLDEN POND*".

5.3    <u>Records</u>.

PRESENTER shall keep and maintain detailed, accurate and complete books and records relating to the sale of all tickets and related deductions therefrom derived from performances of the PRODUCTION at the Theatre hereunder, advertising expenses, yellow card expenses, and all other local Documented Expenses relating to the Engagement (collectively, the "Presenter's Records"). PRODUCER and/or PRODUCER's representatives shall have access to all of Presenter's Records during regular business hours commencing upon the execution of this Agreement and continuing thereafter for a period of one (1) year after the final performance of the PRODUCTION hereunder. PRESENTER's and Theatre's employees shall furnish PRODUCER and/or PRODUCER's representatives with any and all of the Presenter's Records as may be requested by PRODUCER and/or PRODUCER's representatives. PRODUCER and/or PRODUCER's representatives shall have the right to audit and inspect and make copies of the Presenter's Records, and PRESENTER agrees to cooperate with PRODUCER and/or PRODUCER's representatives with respect thereto. In the event such audit or inspection reveals an error in accounting in favor of PRESENTER of two percent (2%) or more, the cost of such audit or inspection shall be borne by PRESENTER.

5.4    <u>Handling of Receipts</u>.

PRESENTER shall ensure that all funds derived from the sale of tickets for performances of the PRODUCTION at the Theatre hereunder shall be held by PRESENTER or Theatre in a secure account and such funds shall not be used for any purpose whatsoever until PRODUCER has received payment of all monies due PRODUCER pursuant to paragraph 3.

5.5    <u>Advance Sale</u>.

Unless otherwise agreed by PRODUCER in advance, PRESENTER agrees (a) to place all tickets on public sale AT LEAST six (6) weeks in advance of the first of the performance(s); (b) not to hold unpaid reservations for tickets later than forty-eight (48) hours prior to the date of each performance; (c) to promote and exploit the performance(s) and use best efforts to secure the largest public attendance and the largest amount of Gross Gross Weekly Box Office Receipts; (d) to furnish display advertising in a form approved by PRODUCER in leading local newspapers commencing at least four (4) weeks prior to the date of the first performance; (e) to expend the advertising budget as set forth herein except that if the Engagement sells out prior to the Engagement date no further advertising expenses will be incurred; and (f) to advertise the performance(s) in prior programs presented by it during the same season. These and other provisions for promotion and advertising are more fully set out in Paragraph 6 below.

5.6    <u>Complimentary Seats</u>.

PRESENTER shall not issue any complimentary tickets (including, but not limited to, advertising trades, promotions, press or other marketing purposes) without the prior written approval of PRODUCER. There shall be no commissions or fees or surcharges charged on complimentary tickets.

Not withstanding the aforementioned, both PRODUCER and Venue/PRESENTER shall receive four (4) complimentary tickets for Opening Night and two (2) complimentary tickets for all other performances. Any unused complimentary tickets shall be released for public sale at least forty-eight (48) in advance of each scheduled performance. Producer must approve any additional complimentary tickets in writing in advance.

5.7    <u>Company House Seats</u>.

PRESENTER shall hold Twenty (20) Company House Seats within ~~rows five (5) to fifteen (15) of~~ **the center orchestra or loge** of the Theatre for purchase by PRODUCER for each performance herein. PRODUCER or its designee will advise PRESENTER of the number of seats to be purchased by PRODUCER no later than forty-eight (48) hours in advance of each scheduled performance; thereafter unused Company House Seats may be released for public sale.

5.8    <u>Group Sales</u>.

PRODUCER will have the right to purchase group tickets (on its own behalf or on behalf of its personnel or affiliates) on a favored nations basis with any other groups purchasing tickets for the PRODUCTION. There shall be no commission charged for any group booked by PRODUCER.

A group is defined as a minimum of **ten (10) tickets**, which are purchased by a single customer. **There shall be no "bundling" of tickets from various performances or different buyers in determining a group minimum.**

5.9     Special Promotions/Sponsorship Requirements.
The form and manner of billing credits and sponsors on tickets shall be determined by PRODUCER, and PRESENTER shall promptly and fully comply with said determination.

PRODUCER will have the right to purchase up to One Hundred (100) seats for the tour sponsor at regular box office prices.

6.      **PROMOTION AND ADVERTISING.**

6.1     Billing.
The form and manner of billing and credits in all advertising, billboards, marquees, programs and publicity shall be determined by PRODUCER, and PRESENTER shall promptly and fully comply with said determination. In the event PRESENTER alters, omits or does not print any of the billing or other program copy or other copy as provided by PRODUCER, PRESENTER shall be liable for any penalty or liability imposed upon PRODUCER by Actors' Equity Association or any other party and shall be liable for all damages, costs and expenses (including attorney's fees and disbursements) resulting from any claim or action brought by Actors' Equity Association or any other party against PRODUCER for breach of any contract with respect to billing.

6.2     Authorized Materials.
PRESENTER agrees to use only those advertising and promotional materials furnished by PRODUCER and said materials will be used only for the purpose of advertising PRESENTER's presentation of the PRODUCTION. No alterations, changes, additions to or deletions from said materials, except for local theatre information, may be made without the prior written consent of PRODUCER, and PRESENTER agrees to indemnify and hold PRODUCER harmless from and against any and all liabilities, claims, losses, causes of action, and expenses (including attorney's fees and disbursements) arising out of any breach or alleged breach of the foregoing undertaking, including without limitation, any penalties imposed by any union.

6.3     Provision, Ownership and Alteration of Materials.
PRODUCER agrees to furnish a complete press kit including production photos and a reasonable number of generic ad slicks and un-imprinted heralds/flyers for the PRODUCTION in such quantities as PRODUCER in its sole discretion deems necessary or desirable. PRESENTER agrees to use only photographs furnished by PRODUCER. PRESENTER agrees to imprint, distribute and display properly and use all materials so received without change or alteration. If any changes or alterations or alternate radio, television or print advertisements for the Engagement are approved by PRODUCER and used by PRESENTER, such changes or alternates shall become the property of PRODUCER free of any liens and encumbrances, subject only to the payment of any required talent payments. Any and all costs and expenses resulting from or associated with such approved changes shall be borne solely by PRESENTER. PRESENTER agrees to abide by PRODUCER's agreements with corporate sponsors and to include PRODUCER's corporate sponsorship logos in advertising as directed by PRODUCER in writing.

PRESENTER acknowledges that PRODUCER controls the rights to use its logo, other artwork and any publicity materials developed for the promotion of the PRODUCTION (including photographs) and for the promotion of the sale of tickets to the PRODUCTION. PRODUCER does not grant PRESENTER or any other party the right to use said materials for any purpose other than the promotion of the sale of the tickets to the PRODUCTION. PRESENTER will be solely liable for all damages, costs and expenses (including reasonable legal fees and disbursements) resulting from any claim or action arising out of the use for any other purpose of any artwork and any publicity materials other than those furnished to PRESENTER by PRODUCER.

6.4     Approval of Ad Campaigns and Marketing Plans.
All advertising campaigns, "buys" and budgets, and marketing, sales and promotional plans must be submitted to PRODUCER's marketing representative no later than thirty (30) days prior to the on-sale and shall be subject to PRODUCER's prior written approval. No advertising may be placed by PRESENTER without PRODUCER's prior written approval.

**Excepting PRESENTER's season brochure which will be sent only to previous series subscribers, PRESENTER agrees not to advertise the Engagement until after December 10, 2006.**

6.5     Campaign and Plan Budgets.
PRESENTER and PRODUCER agree that the advertising budget shall be expended for the sole purpose of advertising/promoting the sale of single tickets and that no season or subscription or institutional advertising shall be included in the advertising budget for the PRODUCTION. PRESENTER shall spend no less than the amount listed on Schedule A per week for advertising unless otherwise approved in writing by PRODUCER. All advertising and promotional costs to be charged in determining PRODUCER's share of Net Adjusted Gross Weekly Box Office Receipts shall be fully documented. Invoices from

Boilerplate Version: 1.8 (6/19/06)　　　　　　　　　　　　　　　　　　　　　　　　Lakeland FL / ON GOLDEN POND
Agreement Revised: 12/7/06　　　　　　　　　　　　　　　　　　　　　　　　　　　February 28, 2007
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 13

advertising agencies alone will not be sufficient support for an expense to be credited to PRESENTER. Newspaper and magazine advertising shall be substantiated by bills from the newspaper or magazine stating dates, lineage and cost of advertisement and by dated tear sheets. Other forms of print advertising shall be supported by bills from printers. TV and radio advertising shall be substantiated by bills from stations and subsequently by affidavits taken from station logs. All artwork or mechanical charges shall be clearly indicated as such and supported by bills from suppliers of services and materials. There is no commission payable on production work. All agency commissions shall also be clearly spelled out in agency bills. All advertising costs shall be based on net costs or "earned rate," and agency commission shall be limited to approved print, electronic and outdoor advertising only and shall not exceed fifteen percent (15%). PRESENTER agrees to supply PRODUCER, upon request, any and all information relating to advertising costs including but not limited to rates, rebates, discounts, commissions and shared commissions relating to the PRODUCTION. No item which fails to conform with the above guidelines shall be included in PRESENTER's expenses.

There shall be no "trade" advertising as said term is used in the industry, except with the prior written consent of PRODUCER. Prior to PRESENTER's presentation of the PRODUCTION, PRESENTER will make available to PRODUCER all subscription mailing announcements, press releases, and all advertising schedules. No commissions, fees or other remuneration shall be taken on advertising placed through any advertising agency which is affiliated with PRESENTER (as defined in paragraph 3.5.4 above), without PRODUCER's prior written consent, except as set forth in Schedule A.

The PRODUCTION must be included as part of the show package purchased by all subscribers on PRESENTER's main Broadway series.

6.6　　Use and Ownership of Commercial.
In the event that PRODUCER provides PRESENTER with a radio and/or television commercial of the PRODUCTION, said commercial shall be used only for the purpose of advertising the Engagement on radio or television (as applicable). No alterations, changes, additions to or deletions from said tape or film may be made in the televising of said commercial may be made in the broadcast of said commercial, except for local performance and ticket information, without the prior written consent of PRODUCER. The commercial and the media on which it is provided shall remain the property of PRODUCER and will be returned to PRODUCER within three (3) days following the final performance of the PRODUCTION herein. PRESENTER will not broadcast (in any media, including on the Internet) any television or radio commercial which has not been provided by PRODUCER or approved in writing by PRODUCER. PRESENTER will send to PRODUCER's advertising agency any information requested concerning the use of commercials provided by PRODUCER in order to allow PRODUCER to comply with its obligations. PRESENTER agrees to indemnify PRODUCER from and against any and all claims, costs, damages and expenses (including legal fees and disbursements) made against PRODUCER and/or suffered or incurred by PRODUCER by reason of PRESENTER's breach or alleged breach of the provisions of this paragraph.

6.7　　No Recording or Broadcasting.
PRESENTER agrees that it will not permit any rehearsal or performance to be recorded, filmed, broadcast, televised or transmitted beyond the Theatre in any media without prior written consent of PRODUCER. PRESENTER must request such consent in writing from PRODUCER no later than seventy-two (72) hours prior to the proposed recording. In addition, PRESENTER agrees that it will not permit any patron that is in the Theatre or anyone else admitted to the Theatre to bring any camera or recording device of any nature whatsoever into the theatre. PRESENTER agrees to indemnify PRODUCER from and against any and all claims, costs, damages and expenses (including legal fees and disbursements) made against PRODUCER and/or suffered or incurred by PRODUCER by reason of PRESENTER's breach or alleged breach of the provisions of this paragraph.

6.8　　Press and Publicity Engagements.
Press requests for appearances and interviews for any of PRODUCER's personnel must be approved in writing by PRODUCER and any payments required for said appearances (including, but not limited to, actors, musicians, wardrobe supervisor, prop master, company manager, and stage manager) shall be paid by PRESENTER. Any such personnel shall be provided, as an engagement expense if approved by PRODUCER, with transportation to and from press and publicity engagements.

It is specifically understood that expenses incurred in PRESENTER's city shall be borne by PRESENTER notwithstanding that the appearance may be broadcast on national media.

6.9　　Ticket Trade.
PRESENTER shall not issue or commit to any complimentary seats for advertising trades, promotions, press (except as specifically permitted pursuant to Paragraph 5.6 above) or other marketing purposes without the prior written approval of

Boilerplate Version: 1.8 (6/19/06)
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND
February 28, 2007
Page 14

PRODUCER or PRODUCER's representative. No trade seats, whether of tickets available to the general public or corporate box seats, shall be chargeable as an advertising expense.

    6.10    <u>Trademarks and Copyright Notices</u>.
If requested so to do, PRESENTER will affix a trademark or copyright notice at such place or places designated by PRODUCER.

    6.11    <u>Compliance with PRODUCER's Requirements</u>.
PRESENTER will duly comply with all advertising and billing requirements as furnished by PRODUCER and as same may in writing be timely amended.

## 7. PROGRAMS.

PRODUCER will furnish PRESENTER with camera ready copy for the program to be provided to audience members at each performance, and PRESENTER agrees, as an engagement expense as set forth in Schedule A, to print, copy and distribute to each audience member free of charge a house program conforming exactly with the program copy furnished by PRODUCER in its entirety. PRESENTER acknowledges that furnishing such programs is a union requirement, and PRESENTER agrees to indemnify and hold PRODUCER harmless from any costs, damages, expenses (including legal fees and disbursements) resulting from breach of this provision. PRESENTER agrees that PRODUCER has approval over the inclusion of any artwork and/or photographs in the program which relate to the PRODUCTION, whether provided by PRODUCER or created and/or provided by PRESENTER. PRESENTER shall not have the right to increase the approved costs set forth in Schedule A without PRODUCER's prior written consent. Further, PRODUCER reserves the right, at PRODUCER's sole discretion, to produce and insert flyers and announcements, including but not limited to cast change slips, ticket offers, merchandise order forms, etc., in the house program without the prior approval of PRESENTER and/or theatre. In addition, neither PRESENTER nor theatre shall insert or permit the insertion of any flyer, announcement, or other printed material in the house program for any purpose, without the prior written approval of PRODUCER.

## 8.    CONCESSIONS.

    Intentionally deleted.

## 9.    INSURANCE.

    9.1    PRESENTER shall during the term hereof, purchase and maintain at its sole cost and expense through companies rated at least (A) and licensed to do business in the state where the performances specified herein take place: policies of Workers Compensation and Employer's Liability Insurance for all persons employed by PRESENTER and/or at the Theatre (including those employees whose salaries shall be reimbursed by PRODUCER hereunder) and providing all statutory benefits as required by relevant state law; Commercial General Liability Insurance with a combined single limit for bodily injury, property damage, and personal and advertising injury of not less than One Million United States Dollars ($US1,000,000.00) and Commercial Umbrella Insurance with a combined single limit for bodily injury, property damage, and personal and advertising injury of not less than One Million United States Dollars ($US1,000,000.00) and both naming PRODUCER and its affiliates, subsidiaries, officers, directors, employees, agents, shareholders and representatives as Additional Insured(s). Each party hereto will maintain Property Insurance on its respective property and hereby waives any and all rights of recovery, claims and causes of action against the other, its affiliates, subsidiaries, officers, directors, employees, agents, shareholders and representatives for any loss or damage that may occur to any of its personal property for any reason and further covenants that its respective insurers will not hold any right of subrogation against the other party hereto. Each party hereto agrees to cause its respective policy or policies to be endorsed, if necessary, to effect this waiver of subrogation. All policies shall provide that in the event of cancellation, non-renewal, or material change, PRESENTER shall give PRODUCER thirty (30) days prior written notice of such. Certificates of Insurance evidencing compliance with all insurance provisions in this Agreement shall be delivered to PRODUCER as far in advance of the Engagement as reasonably possible and no later than twenty-four (24) hours prior to the first performance hereunder. PRODUCER shall carry equivalent insurance.

    9.2    For the purpose of Commercial General Liability Insurance and Umbrella Insurance required to be carried pursuant to the provisions hereof, PRESENTER shall be deemed to be primarily liable for all acts, occurrences or omissions arising out of or relating to the operation of the Theatre premises as distinguished from the presentation of the PRODUCTION in the Theatre, and PRODUCER shall be deemed to be primarily liable for all acts occurrences or omissions arising out of or relating to the operation of the PRODUCTION as distinguished from the operation of the Theatre.

Boilerplate Version: 1.8 (6/19/06)
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND
February 28, 2007
Page 15

## 10. INDEMNIFICATION.

10.1  PRESENTER agrees to indemnify, defend and hold harmless PRODUCER and its affiliates, subsidiaries, officers, directors, employees, agents, shareholders and representatives from and against any and all liabilities, claims, suits, losses, damages, causes of action, and expenses (including reasonable legal fees and disbursements) arising out of or in connection with: (i) loss, injury or damage to the persons or personal property of audience members, PRESENTER, Theatre, the employees and agents of each of PRESENTER and Theatre, any lessees or concessionaires of the Theatre and PRODUCER and its representatives; and (ii) any breach or alleged breach of any of PRESENTER's representations, warranties, undertakings, obligations or agreements herein contained; and (iii) all actions, claims, or demands by third parties, based upon any acts, defaults, or omissions of PRESENTER, the Theatre, and/or their respective employees, invitees and/or independent contractors.  PRODUCER shall provide written notice to PRESENTER of any claim to which the foregoing indemnities apply and shall cooperate with PRESENTER in the defense thereof. PRESENTER further agrees (without limiting the generality of the provisions of this paragraph) to indemnify, defend, and hold harmless PRODUCER from and against all liability, obligation, or expense incurred in connection with or relating to any actions, claims, or demands by third persons arising out of or relating to the operation of the Theatre premises.

10.2  PRODUCER hereby agrees to indemnify, defend and hold harmless PRESENTER from and against any and all liabilities, claims, suits, losses, damages, causes of action and expenses (including reasonable legal fees and disbursements) arising out of or in connection with any claim by a third party which, if proven, would constitute a breach of any representations, warranties and agreements made by PRODUCER herein. PRESENTER shall provide written notice to PRODUCER of any claim to which the foregoing indemnities apply and shall cooperate with PRODUCER in the defense thereof.

10.3  PRODUCER shall have the right, but not the obligation, to control the defense of any claim or proceeding to which it is a party or indemnitor (i.e., the party who indemnifies) in its sole discretion.  If PRODUCER shall elect to control such defense, PRESENTER may, at PRESENTER's sole expense, participate in the defense thereof.  If PRODUCER shall elect not to control such defense, PRODUCER may nevertheless participate in such defense, at PRODUCER's sole cost and expense.

## 11.      IMPOSSIBILITY OF PERFORMANCE.

In the event that any performance of the PRODUCTION shall be prevented by act of God, fire, national or local calamity or emergency, death or physical or other disability of any of the personnel forming part of or used in connection with the PRODUCTION, the acts or regulations of public authorities or labor unions, labor difficulties, strike, boycott, civil tumult, war, riot, epidemic, interruption or delay of transportation service, the breach of contract on the part of any third party, the unlawful act of any third party or any other event of force majeure beyond the reasonable control of the parties (collectively and individually, "Act of God"), PRODUCER and PRESENTER shall be relieved of their respective obligations hereunder with respect to the performance(s) so prevented and neither PRODUCER nor PRESENTER shall be under any obligation to present performance(s) at any other time.

In the event PRESENTER and PRODUCER jointly decide the Theatre should be closed because of any Act of God, neither party shall have any financial claim on the other resulting from losses during the period of closing.  If, however, the Theatre is closed due to the negligence or other fault of PRESENTER (it being understood that a strike shall not be deemed the fault of PRESENTER unless provoked by PRESENTER) or if the Theatre is closed without the prior written agreement of PRODUCER, PRESENTER shall not be excused from the payments required under the terms of this Agreement as though all of the performances provided for herein had occurred.

## 12. TERMINATION OF PRODUCTION.

In the event the PRODUCER elects to terminate the run of Production prior to the final performance of the Engagement and posts a notice to that effect, PRODUCER shall advise PRESENTER in writing of such action and shall have no further liability except (i) to make a pro rata return of any Guarantee paid and (ii) to reimburse Presenter for any actual documented expenses as may be reasonable and customary, approved by PRODUCER and incurred theretofore by PRESENTER, in connection with performances scheduled but not performed due to PRODUCER's termination of the run.

## 13. REMEDIES.

13.1    Default.
If PRESENTER materially breaches or defaults in the performance of any of its representations, warranties or agreements or undertakings hereunder (a "Default"), then PRODUCER shall have the right to terminate this Agreement and its obligations hereunder.  PRESENTER acknowledges that PRODUCER has refused and will refuse profitable offers for other performances of the PRODUCTION in order to enter into this Agreement and that PRODUCER has incurred and will incur

substantial out-of-pocket expenses in connection therewith. In the event of Default pursuant to which PRODUCER terminates this Agreement and its obligations hereunder, PRESENTER agrees that any and all sums still payable to PRODUCER as the Guarantee will become immediately due and payable, and such sums, together with any sums theretofor paid by PRESENTER, shall be retained by PRODUCER as liquidated damages (and not as a penalty), and PRODUCER shall have the right to present any Letter of Credit furnished it for payment and to use the proceeds therefrom for the payment of said Guarantee. In the event of a Default PRODUCER shall have, in addition and not in lieu of those remedies set forth above, the right to exercise all of its rights and remedies against PRESENTER at law, singly or cumulatively, at PRODUCER's sole discretion. Nothing herein shall in any manner affect any of PRODUCER's rights set out elsewhere in this Agreement or any of PRODUCER's rights at law or in equity.

    13.2    Prior Default to Third Party.

If on or before the date of any scheduled performance PRESENTER has failed, neglected, or refused to perform any obligations pursuant to any contract with any other theatrical production or performer for any other engagement or if the financial standing or credit of PRESENTER has been impaired or is, in the sole opinion of PRODUCER, unsatisfactory, PRODUCER shall have the right to demand the payment of the Guarantee provided for herein forthwith. If PRESENTER fails or refuses to make such payment forthwith, such failure or refusal shall constitute a Default and the terms set forth in Paragraph 13.1 shall apply.

    13.3    Bankruptcy or Insolvency.

In the event PRESENTER shall: (a) file a petition in voluntary bankruptcy or request reorganization under any bankruptcy reorganization or insolvency law, or consent to the filing of any such petition; or (b) make an assignment for the benefit of its creditors or admit in writing its inability to pay its debts generally as they become due; or (c) consent to the appointment of a receiver, trustee or liquidator of all or a substantial part of its properties; or (d) have a petition for involuntary bankruptcy, reorganization, or appointment of a receiver, trustee or liquidator filed against it and such petition shall remain in effect for more that thirty (30) days; or (e) be adjudicated bankrupt, or insolvent; or (f) have all or a substantial part of its property sequestered by court order and such order shall remain in effect for more than thirty (30) days, none of such occurrences shall affect the right of PRODUCER to present for payment any Letter of Credit furnished it hereunder or impair or affect its right to refrain from furnishing the PRODUCTION pursuant to this Agreement in the event of the happening of the contingency therein set forth or to be paid the monies therein provided to be paid to it even if the PRODUCTION is not so furnished.

## 14. BOOKING AGENT.

It is expressly agreed that Avid Touring Group, Ltd. is authorized to act as PRODUCER's designee on PRODUCER's behalf, but that Avid Touring Group, Ltd. is not a producer or presenter of the PRODUCTION or a party hereto, and that Avid Touring Group, Ltd. shall not be held responsible by PRESENTER for any of PRODUCER's obligations hereunder, or by PRODUCER for any of PRESENTER's obligations hereunder. PRESENTER and PRODUCER each hereby agrees to indemnify, defend and hold harmless Avid Touring Group, Ltd. and its respective employees, agents and representatives from and against any and all liabilities, losses, costs and expenses (including reasonable legal fees and disbursements) incurred or suffered by Avid Touring Group, Ltd. as a result of any claims arising from or relating to this Agreement or the presentation of the PRODUCTION by PRESENTER except to the extent that it is finally adjudicated that such claim arose solely from Avid Touring Group, Ltd.'s gross negligence or willful misconduct.

## 15. RESOLUTION OF DISPUTES.

This Agreement and the performance thereof shall be construed in accordance with the law of the State of New York applicable to contracts fully performed therein. Any controversy or claim arising out of, or relating to this Agreement, or any alleged breach thereof, shall be settled by binding arbitration before a single arbitrator in New York, New York, in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator may be entered in the highest court of the forum, state or federal, having jurisdiction thereof. Each of the parties hereby consents and submits to the jurisdiction of the State and Federal courts located in the County of New York and consents to the venue thereof, and consents to service of process by registered or certified mail at the address to which notices are to be given and agrees that such service shall be deemed effective as if personal service had been made within New York State, New York County.

## 16. REPRESENTATIONS AND WARRANTIES.

    16.1    PRESENTER hereby separately represents and warrants that: (i) PRESENTER is authorized, empowered and able to

Boilerplate Version: 1.8 (6/19/06)
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND
February 28, 2007
Page 17

enter into and fully perform its obligations hereunder; (ii) the party executing this Agreement on behalf of PRESENTER is an authorized representative of PRESENTER, duly authorized to sign on PRESENTER's behalf; (iii) PRESENTER's entry into this Agreement, and its performance hereunder, does not and shall not violate any law, statute or regulation or any contractual obligation of PRESENTER; (iv) any materials supplied by PRESENTER in connection with the terms of this Agreement, including, without limitation, any promotional and advertising materials, do not and will not violate any law or infringe upon or violate any copyright, trademark, right of privacy or any other right of any nature or kind of any third party; (v) PRESENTER shall obtain all licenses and permits necessary to be secured, in order to permit the presentation and performance of the PRODUCTION at the Theatre as scheduled; and (vi) PRESENTER will not do or suffer to be done anything in said premises during such period, in violation of any laws, regulations, ordinances, rules or requirements.

16.2    PRODUCER hereby represents and warrants that: (i) PRODUCER is authorized, empowered and able to enter into and fully perform its obligations hereunder; (ii) the party executing this Agreement on behalf of PRODUCER is an authorized representative of PRODUCER, duly authorized to sign on PRODUCER's behalf; (iii) PRODUCER's entry into this Agreement, and its performance hereunder, does not and shall not violate any law, statute or regulation or any contractual obligation of PRODUCER; (iv) any materials supplied by PRODUCER in connection with the terms of this Agreement, including, without limitation, any promotional and advertising materials, do not and will not violate any law or infringe upon or violate any copyright, trademark, right of privacy or any other right of any nature or kind of any third party; and (v) PRODUCER will not do or suffer to be done anything in the Theatre in violation of any laws, regulations, ordinances, rules or requirements.

## 17. MISCELLANEOUS.

This Agreement may not be assigned or transferred by PRESENTER without the prior written consent of PRODUCER. This Agreement, including its Schedules and Riders, represents the full understanding between the parties and supersedes all prior agreements, and neither party shall be bound by modifications or additions to this Agreement unless set forth in a writing signed by both parties. In the event of any inconsistency between the provisions of this Agreement and those contained in PRODUCER's Schedules and Technical Requirements Rider, the provisions of PRODUCER's Schedules or Technical Requirements Rider, as applicable, shall control. No waiver of any provision of this Agreement shall be binding unless agreed in writing and signed by PRODUCER and PRESENTER, and no waiver of any breach hereof shall be construed to be a continuing waiver or consent to any subsequent breach hereunder. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, heirs, executors, administrators, successors and permitted assigns. Nothing contained in this Agreement shall be construed to require the commission of any act contrary to law. Should any provision, or portion of any provision, of this Agreement be adjudged invalid or unenforceable for any reason, the validity or enforceability of the remaining provisions or of the other portions of the provision(s) so adjudged shall not be affected thereby, and any provisions or portions thereof which are illegal, invalid, or otherwise unenforceable shall be curtailed and restricted only to the extent necessary to bring them within the legal requirements. Paragraph headings are used herein for convenience only and shall not be referred to in the interpretation of this Agreement. Use of any gender herein shall be deemed to refer to any other where appropriate from the context. This Agreement may be signed in counterparts, all of which taken together shall constitute a binding agreement. This Agreement shall not be binding upon PRODUCER until executed by PRODUCER and by PRESENTER. Facsimile signatures shall be valid and binding.

Nothing in this agreement shall obligate Producer to afford subsequent presentation rights to the Presenter.

## 18. CURRENCY

All currency amounts referred to in this agreement, attached schedules and/or riders shall be in United States currency unless otherwise specified in writing.

## 19. NOTICES.

All correspondence and/or notices to PRESENTER and PRODUCER hereunder shall be in writing addressed to the parties at the addresses designated below, or such other address as may be provided by notice duly given, with an additional copy by fax to the fax number set forth below. Copies of all correspondence and/or notices to PRODUCER hereunder shall also be given to Avid Touring Group, Ltd., 234 West 44th Street, Suite 902, New York, New York 10036, with an additional copy by fax to 212-840-4397.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Boilerplate Version: 1.8 (6/19/06)
Agreement Revised: 12/7/06

Lakeland FL / ON GOLDEN POND
February 28, 2007
Page 18

AGREED AND ACCEPTED:

PRESENTER:

_____
POLK THEATRE, INC.
By: Leslie A. Sikora, Executive Director
127 South Florida Avenue
Lakeland, FL 33801
Tel: (863) 682-7553
Fax: (863) 682-8227

PRODUCER:

_____
JFP Touring, LLC.
By: Jeffrey Finn
234 W. 44th Street, Suite 902
New York, NY 10036
Tel: (212) 840-4393
Fax: (212) 840-4397
Employer Identification #: 20-5029854

Engagement Agreement Reviewed By:
Avid Touring Group, Ltd.

_____
AVID TOURING GROUP, LTD.
By: L. Glenn Poppleton / Ron Gubin
234 W. 44th Street, Suite 902
New York, NY 10036
Tel: (212) 840-4393
Fax: (212) 840-4397