USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/12/07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

JFP TOURING, LLC,                                      07-CV-3341 (CM) (RLE)

            Plaintiff,

      -against-

POLK THEATRE, INC.,

            Defendant.
_____x

## DECISION AND ORDER
## DENYING DEFENDANT'S MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, TO TRANSFER VENUE

McMahon, J.:

Plaintiff JFP Touring, LLC ("JFP") brings this diversity action against defendant Polk

Theatre, Inc. ("Polk Theatre"), alleging that defendant breached its contract with plaintiff and

fraudulently misrepresented its actions regarding the execution of a final, integrated agreement.

JFP is a New York-based theatrical producer that owns the rights to produce the play, *On

Golden Pond.* Polk Theatre is a non-profit regional theatre located in Lakeland, Florida. The

Theatre initiated contract negotiations with JFP to present a traveling version of *On Golden Pond*

at its theatre, following the show's Broadway run. A month into their negotiations, the parties

signed an Engagement Memorandum that outlined the basic terms of their agreement. Two

months later, JFP mailed the Theatre four unexecuted copies of the Engagement Agreement that

was to serve as the fully integrated contract between the parties. According to plaintiff, the

Theatre informed JFP on several occasions that the Theatre had signed the Engagement

Agreement and mailed it back to JFP in New York. However, it appears that neither party ever

actually signed the Engagement Agreement.

Several weeks before the Theatre was scheduled to show JFP's production of *On Golden Pond* at the theatre, defendant notified JFP that it would not be presenting show, that it would not be paying any fees outlined in either the Engagement Memorandum or Engagement Agreement, and that it was not contractually obligated to do either. The instant lawsuit followed shortly after.

Before this court is defendant Polk Theatre's motion to dismiss the complaint for lack of personal jurisdiction or, in the alternative, to transfer venue to the Middle District of Florida, Tampa Division. For the reasons stated below, defendant's motion is denied.

## I. Background

### A. *The Parties*

Plaintiff JFP is a New York limited liability company with offices located at 1501 Broadway, Suite 2003, New York, New York. (Compl. ¶ 1.) JFP's website, www.jeffreyfinnproductions.com, also indicates the company's offices are located in New York. (JFP Website, attached as Ex. J to Affidavit of Jeffrey Finn ("Finn Aff.").) Plaintiff is a theatrical producer and owns the rights to produce *On Golden Pond*, a play that originated as a Broadway production and "continued as a 'bus and truck' tour" after its New York run concluded. (Finn Aff. ¶ 56; Compl. ¶ 3.) The technical supervisor, production stage manager, head of sound, head of props, and wardrobe supervisor for *On Golden Pond* were all located in New York (Finn Aff. ¶ 45), and according to JFP's President, Jeffrey Finn, all "payroll" and "technical" issues related to the show "were dealt with in New York." (Id. ¶ 46.) Moreover, the show's entire sound, lighting, costumes, and set designs were created in New York by New York-based artists, operated by a New York-based technical crew, and supplied by New York-based lighting and sound equipment

2

companies. (Id. ¶ 55.) All advertisements for the show requested and used by Polk Theatre were created for the Broadway stage by a New York-based advertisement agency. (Id. ¶ 55.)

Defendant Polk Theatre, Inc. ("Polk Theatre") is a non-profit organization, incorporated in Florida, and comprised solely of a single venue located in Lakeland, Florida. (Affidavit of Leslie Sikora ("Sikora Aff.") ¶ 3.) The Theatre does not own any property, nor does it maintain any offices or bank accounts, outside of Florida. (Id. ¶ 29.) A full-time staff of three supervise the Theatre's operations: an Executive Director (Leslie Sikora), an Administrative Assistant and a Technical Director. Five part-time staff members and volunteers also assist on projects, as needed. (Id. ¶¶ 7-8.) Although the Theatre receives financial support from rentals, fundraisers and memberships, its primary source of revenue is its performing arts series, approximately six live performances of small plays, musicals and concerts presented at the Theatre between September and April. (Id. ¶¶ 6, 10.) Ms. Sikora is personally responsible for booking shows for the performing arts series, and conducts such negotiations with touring companies via telephone, fax, mail and email. (Id. ¶¶ 11-12.)

## B. Negotiations for On Golden Pond

In August 2006, Ms. Sikora learned that she needed to replace a cancelled show prior to the start of the 2006-07 performing arts season. (Id. ¶ 13; Oct. 24, 2006 Email, attached as Ex. C to Finn Aff.) After discovering that *On Golden Pond* was touring, she researched the show on the internet and contacted plaintiff JFP, the producer of the show, to inquire about the show's availability. (Sikora Aff. ¶ 14.) Ms. Sikora never heard back from JFP, but was instead contacted by Avid Touring Group, Ltd. ("Avid"), the exclusive agent through which JFP produces and

3

books performances of *On Golden Pond* at theatres throughout the United States.[1] (Id. ¶ 17;

Compl. ¶ 4.) Prior to the Theatre's decision to cancel the show on February 2, 2007, Ms. Sikora

communicated only with Avid's agents in New York, its marketing representative in Ohio, and its

technical representatives (whose locations cannot be gleaned from the record before this court).

(Sikora Aff. ¶ 17.) Moreover, it is undisputed that all of these communications were conducted

via telephone, mail and email, and that no Polk Theater representative ever traveled to New York

or otherwise personally entered New York to discuss the Theatre's presentation of *On Golden

Pond* with JFP or Avid. (Id. ¶¶ 18-20.)

Between August 2006 and January 2007, Ms. Sikora and Avid discussed – via telephone,

mail and email – the viability of the show playing at Polk Theatre. (Id. ¶ 15.) After Ms. Sikora

provided Avid with the Theatre's physical and technical specifications, Avid assured her that the

Theatre had the technical capacity to present the show; Avid further advised Ms. Sikora that no

alterations to the Theatre would be required. (Id. ¶ 16.)

## C. The Engagement Memorandum

On September 18, 2006, after approximately one month of negotiating, JFP and Polk

Theatre "reached a meeting of the minds" regarding the presentation of the show in Florida.

(Compl. ¶ 6.) Avid mailed the Theatre a copy of the *On Golden Pond* Engagement Memorandum

("Engagement Memorandum"), dated September 18, 2006, to Ms. Sikora in Florida. (Id.; Sikora

Aff. ¶ 22.) According to plaintiff, this Memorandum "codified the numerous terms and

conditions negotiated" by the parties. (Compl. ¶ 6.) However, according to Ms. Sikora's

---

[1] Avid maintains a website, www.avidtouring.com, that indicates the company's offices
are located in New York. (Avid Website, attached as Ex. K to Finn Aff.)

affidavit, Avid informed her that the Memorandum was a boilerplate document that "was meant to

outline some of the terms" regarding production of the show at Polk Theatre; Avid further

instructed Ms. Sikora to note any changes in the Memorandum itself and such changes would be

incorporated in a later *On Golden Pond* Engagement Agreement ("Engagement Agreement"),

which would represent the final, integrated agreement between the Theatre and JFP. (Sikora Aff.

¶¶ 23-24.)

The first page text of the Engagement Memorandum supports Ms. Sikora's understanding:

> Our office [Avid] will use this Engagement Memorandum and attachments to
> generate your Engagement Agreement. Please review and sign this Engagement
> Memorandum and attachments and return them to us so that we may issue the
> Engagement Agreement. This engagement is subject to the terms of the fully
> executed Engagement Agreement, which shall be derived, in part, from the terms
> agreed upon in this Engagement Memorandum.

(Engagement Memorandum, attached as Ex. A to Finn Aff., at 1.)

The Engagement Memorandum contains few terms relevant to the personal jurisdiction

issue. The "Presenter" was listed as "Polk Theatre, Inc," the "Venue/City" was listed as "Polk

Theatre/Lakeland, FL," the "Load-in" date was listed as February 28, 2007, and the "Engagement

period" was listed as "One (1) Day, Two (2) PERFORMANCES, Wednesday, February 28,

2007." (Id.) Polk Theatre was required to pay all compensation due to JFP, including the

$22,500.00 deposit, into JFP's account at JPMorgan Chase Bank in New York, New York. (Id. at

2.) The Memorandum further required Polk Theatre to obtain approval for advertising and

marketing expenses and materials from either JFP or JFP's marketing representative, Anita

Dloniak, who was based in Cleveland, Ohio. (Id. at 4.)

On October 27, 2006, Ms. Sikora signed the Memorandum in Florida, after changing a

5

handful of terms related to the "Company House Seats" and the ticket pricing provided in the accompanying Schedule B, and faxed it back to Avid in New York.[2] (Sikora Aff. ¶ 25; Engagement Memorandum, attached as Ex. A to Finn Aff., at 4 and Schedule B)

## D. The Engagement Agreement

On December 7, 2006, Avid mailed four copies of the proposed Engagement Agreement to Ms. Sikora in Florida. (Compl. ¶ 13; Sikora Aff. ¶ 26; Cover Letter, attached as Ex. D to Finn Aff.) In its cover letter, Avid asked Ms. Sikora to "discuss any alterations to this contract, prior to marking the contract" with an Avid representative. (Cover Letter, Finn Aff., Ex. D) (emphasis in original.) The letter further requested Ms. Sikora to sign the Agreement in four places: on the last page of the Agreement, on Schedule A, on Schedule B, and on the last page of the Technical Rider. Once the contract was signed, Ms. Sikora was asked to return it to Avid, who would "then see to it that they are countersigned by" JFP. (Id.)

The Engagement Agreement included the terms found in the Engagement Memorandum, and also added what plaintiff refers to as "boilerplate language" regarding "(i) box office income reconciliation, (ii) defendant's obligations regarding theatre operation, (iii) promotion and advertising, (iv) insurance," and (v) a choice of law clause. (Compl. ¶ 13; Finn Aff. ¶ 15.) Where the original signed Memorandum and its two accompanying schedules numbered seven pages, the Agreement, its schedules, and the ten-page Technical Rider numbered thirty pages.

Section 15 of the Agreement contains the following clause:

---

[2] It is clear from the fax cover page that Ms. Sikora only signed and faxed the Memorandum and two accompanying Schedules A and B, and not the Technical Rider that JFP says was also signed by Ms. Sikora. (Finn Aff. ¶ 3.) The fax cover says that Ms. Sikora faxed eight pages to Avid (including the cover page); the Memorandum and two schedules number seven pages, while the Technical Rider is itself ten pages long.

6

15. Resolution of Disputes
This Agreement and the performance thereof shall be construed in accordance with
the law of the State of New York applicable to contracts fully performed therein.
Any controversy or claim arising out of, or relating to this Agreement, or any
alleged breach thereof, shall be settled by binding arbitration before a single
arbitrator in New York, New York, in accordance with the Rules of the American
Arbitration Association, and judgment upon the award rendered by the Arbitrator
may be entered in the highest court of the forum, state or federal, having
jurisdiction thereof.  Each of the parties hereby consents and submits to the
jurisdiction of the State and Federal courts located in the County of New York and
consents to the venue thereof, and consents to service of process by registered or
certified mail at the address to which notices are to be given and agrees that such
service shall be deemed effective as if personal service had been made within New
York State, New York County.

(Engagement Agreement, attached as Ex. D to Finn Aff., at § 15.)  The Agreement contains many

other terms, none of which are relevant because – as discussed below – neither Polk Theatre nor

JFP appears to have actually signed the contract.

Shortly after receiving the proposed Engagement Agreement, on December 14, 2006, Ms.

Sikora began a string of email communications to Avid representatives regarding her concern that

*On Golden Pond* "is a union show.  We are not a union house nor can we afford to be." (Dec. 14,

2006 Email, attached as Ex. E to Finn Aff.)  Ms. Sikora later suggested some alternatives to using

a union crew, including hiring a local Florida non-union crew, or reducing the union crew's fees.

(See Dec. 19, 2006 Email, attached as Ex. E to Finn Aff.)  According to Mr. Finn's affidavit, Ms.

Sikora's request to use a non-union crew

necessitated a great deal of negotiation among Plaintiff, Defendant and IATSE, the
New York union that represents Plaintiff's technical crew.  Defendant expressly
requested that Plaintiff negotiate on Defendant's behalf and as Defendant's agent-
in-fact in New York with IATSE regarding the New York IATSE contract and to
obtain permission for Defendant to use a local non-union crew as to Defendant's
presentation only.  Plaintiff successfully secured such a modification of the IATSE
union contract by getting IATSE to agree to a non-union local crew that would
work side by side with Plaintiff's union crew from New York.

7

(Finn Aff. ¶¶ 52-53.)[3]

On January 19, 2007, Polk Theatre emailed Avid a copy of a cover letter, dated January 9, 2007, that the Theatre claims to have mailed to Avid on January 9, 2007. (Compl. ¶ 16.) The cover letter was signed by Ms. Sikora and purported to enclose "four (4) executed copies of the Agreement for *On Golden Pond* appearing at our theatre February 28, 2007 for two shows." (Jan. 9, 2007 Cover Letter, attached as Ex. F to Finn Aff.) However, the email did not contain the executed contracts. (Id.; Compl. ¶ 17.) The cover letter further noted that, "Alterations regarding the union section of the contract have been made following discussions between [Avid] and myself that non-union crew would be acceptable." (Id.) In her email enclosing this cover letter, Ms. Sikora also wrote:

As far as I know [the contracts] were mailed after Ron and I worked things out. I make folders for all our events and I have a copy of the contract in there. As afar as I knew the rest had been Fed Exed. Let me do some searching and I'll get back to you this afternoon. Our part of the Fed Ex receipt is in my folder as well.

(Jan. 19, 2007 Email, attached as Ex. H to Finn Aff.) The original copy of this cover letter, containing the executed Agreement, was never actually received by Avid. (Compl. ¶ 17.)

On January 22, 2007, Ms. Sikora emailed Avid that the four copies of the executed Agreement had been lost, had just been located, and were now being Fed Exed to Avid for January 23, 2007 delivery. (Jan. 22, 2007 Email, attached as Ex. L to Finn Aff.; Compl. ¶ 18.)

---

[3] Mr. Finn further states that "*On Golden Pond* is subject to the ongoing rules, regulations and supervision of the New York theatrical unions. The production was designated by the three New York unions connected to the show . . . as having a New York 'point of organization' or 'point of origin'. This means . . . that although these unions may have offices around the United States, it is the New York offices that administer and oversee ongoing union compliance . . . . Among Plaintiff's obligations were the obligations to present *On Golden Pond* in full compliance with these three New York unions." (Finn Aff. ¶¶ 48-51.)

On January 26, 2007, plaintiff conducted a site survey of Polk Theatre in preparation for

the load-in and performances scheduled to take place on February 28, 2007. (Compl. ¶ 19.) This

appears to be the only face-to-face meeting between plaintiff and defendant.

## E. Cancellation of On Golden Pond

On January 28, 2007, Polk Theatre failed to pay JFP the sum of $22,500.00, the deposit

required under both the (signed) Engagement Memorandum and the (unsigned) Engagement

Agreement. (Id. ¶ 20.)

According to Ms. Sikora's affidavit, "numerous issues arose which were not disclosed to

me during the discussions that would have cost the Theatre thousands of dollars to correct to hold

the Show." (Sikora Aff. ¶ 27; see also Feb. 2, 2007 Email, attached as Ex. 1 to Finn Aff., at 1.)

Because making such alterations would have cost the Theatre a substantial amount of money, Ms.

Sikora informed Avid on February 2, 2007 via telephone and email that the Theatre would not be

able to present *On Golden Pond* and the Theatre would not pay any sum of money to JFP under

the Memorandum or Agreement. (Compl. ¶ 21; Sikora Aff. ¶ 27.) Her termination email noted

that, "No show has confounded us as much as this show . . . . I decided the unsent contracts would

have to remain unsent." (Feb. 2, 2007 Email, Finn Aff., Ex. I.) Ms. Sikora claims that neither she

nor JFP ever signed the Engagement Agreement (Sikora Aff. ¶ 26), and no signed copy of the

Agreement has been submitted to this court.

It is undisputed that the Theatre never paid any money to either JFP or Avid in connection

with the Theatre's presentation of *On Golden Pond.* (Id. ¶ 28.)

## F. Procedural History

On March 27, 2007, JFP filed its Complaint in the Supreme Court of the State of New

9

York, New York County. In its accompanying Summons, JFP states that the basis of venue is
"Plaintiff's Residence." JFP alleges two causes of action against Polk Theatre for breach of
contract and fraudulent misrepresentation. (Compl. ¶¶ 22-31.)

On April 27, 2007, Polk Theatre removed the lawsuit to this court on the basis of diversity
jurisdiction. (Docket Entry ("D.E.") 1.) On May 1, 2007, the Theatre filed the instant motion to
dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue from the Southern
District of New York to the Middle District of Florida, Tampa Division.

## II. Standard of Review

In considering a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a district
court must construe the facts from the pleadings and affidavits in the light most favorable to the
plaintiff and, where doubts exist, they are resolved in plaintiff's favor. See Linzer v. EMI
Blackwood Music, Inc., 904 F. Supp. 207, 211 (S.D.N.Y. 1995); see also Hoffritz for Cutlery, Inc.
v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985); St. Paul Fire & Marine Ins. Co. v. Eliahu Ins.
Co., No. 96-CV-7269, 1997 WL 357989, at *1 (S.D.N.Y. June 26, 1997) ("all pertinent
documentation submitted by the parties may be considered in deciding the motion"). However,
unlike motions made under Rule 12(b)(6), which must be converted by a court into a motion for
summary judgment before extraneous material may be considered, other Rule 12(b) motions need
not be converted for a court to look beyond the pleadings. Linzer, 904 F. Supp. at 212.

Implicit in this factual review is the understanding that "a plaintiff bears the burden of
establishing jurisdiction over a defendant;" however, until "a full evidentiary hearing or a trial on
the merits is held, [a plaintiff] need only set forth *prima facie* evidence of personal jurisdiction."
Id. at 211 (internal quotation marks and citations omitted). Thereafter, a plaintiff must establish

10

jurisdiction by a preponderance of the evidence. Atlantic Mutual Ins. Co. v. M/V Humacao, 169

F. Supp. 2d 211, 214 (S.D.N.Y. 2001); Linzer, 904 F. Supp. at 211.

## III. Discussion

### A. *Motion to Dismiss for Lack of Personal Jurisdiction*

In its motion to dismiss, defendant Polk Theatre argues that it is not subject to personal

jurisdiction in New York because it did not conduct activities of sufficient quality and nature

"such that it is reasonably fair" to require the Theatre to conduct its defense in New York. (Def.

Br. at 5.) Defendant contends that all communications relating to the contract were conducted in

Florida, and defendant's performance under the contract was to occur in Florida. (Id. at 6-7.)

Moreover, Polk Theatre notes that it does not have a New York office, owns no property in New

York, maintains no bank accounts in New York, and never sent a representative to New York to

discuss the contract with JFP. (Id. at 7.)

Plaintiff JFP counters that this court has personal jurisdiction over Polk Theatre because

the Engagement Agreement contains a choice of law provision, naming New York state and

federal courts as the appropriate venue for the adjudication of all Agreement disputes. (Pl. Opp.

Br. at 1.) This initial argument can be dispensed with immediately. It is undisputed that neither

party signed the Engagement Agreement, and this choice of law provision – which does not

appear in the signed Engagement Memorandum – is unquestionably of no effect.[4]

---

[4] I further note that JFP's observation that this provision "contains certain Arbitration
language," but that "neither Plaintiff nor Defendant has invoked said clause and has elected
instead to proceed in Federal Court" (Pl. Opp. Br. at 1 n.1), is unpersuasive. One of the
Theatre's primary arguments is that it never signed the Engagement Agreement, and is not bound
by the choice of law clause. Given this position, the Theatre could not reasonably be expected to
move this court for an order compelling arbitration. JFP's decision to sue rather than commence
an arbitration suggests to this court that JFP questions the applicability of the Engagement

11

JFP further argues that jurisdiction exists because the Theatre expressly requested that JFP negotiate a modification of its contract with a New York union so that the Theatre could use a non-union crew for the show's production. (Id. at 2-3.) Third, JFP argues that the Theatre's performance under the Agreement – i.e., payment of the contract price to JFP's New York bank account, and faxing of box office reports to JFP's New York fax machine – occurred in New York. (Id. at 4.) Fourth, JFP notes that the Theatre sought out JFP via the internet, and corresponded with Avid extensively regarding contract negotiations. (Id. at 5.) Last, JFP argues that *On Golden Pond* – the subject matter of the Agreement – originated as a Broadway production, its entire production team is New York-based (including the technical supervisor, production stage manager, head of sound, head of props, wardrobe supervisor, payroll supervisor, and advertising firm), and its sound, lighting, costume, and set designs were created and operated in New York by New York-based artists and technicians. (Id. at 4.)

A federal court in a diversity action "must look to the forum state's general jurisdictional or long-arm statute to determine whether *in personam* jurisdiction exists" over a non-domiciliary defendant. Linzer, 904 F. Supp. at 211; see also Newbro v. Freed, 337 F. Supp. 2d 428, 430 (S.D.N.Y. 2004). New York's long-arm statute provides in relevant part, "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y.C.P.L.R. § 302(a)(1) (McKinney 2007). Thus, to justify the exertion of personal jurisdiction over a defendant based on § 302(a)(1), two conditions must be met: "first, the non-domiciliary must transact business within the state; second, the claim against the non-domiciliary must arise

Agreement to any aspect of this dispute.

12

out of that business activity." Mantello v. Hall, 947 F. Supp. 92, 99 (S.D.N.Y. 1996) (internal quotation marks and citations omitted); see also Newbro, 337 F. Supp. 2d at 431.

The first prong of § 302(a)(1) requires that non-domiciliary transact business in New York. To "transact business," a non-domiciliary must "purposefully avail[ ] itself of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." Mantello, 947 F. Supp. at 99 (internal quotation marks and citations omitted). The factors a court considers to determine whether an out-of-state defendant transacts business in New York include: "1) the existence of an ongoing contractual relationship; 2) whether the contract was negotiated or executed in New York; 3) if there are any choice of law provisions in the contract; and 4) whether the contract requires franchisees to send notices or payments into New York." Id.; see also Agency Rent A Car System, Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29-30 (2d Cir. 1996). Although all factors are relevant, "no one factor is dispositive." Cuccioli v. Jekyll & Hyde Neue Metropol Bremen Theater Produktion GmbH & Co., 150 F. Supp. 2d 566, 570 (S.D.N.Y. 2001). Because a court must examine "the totality of circumstances," other factors may also be considered. Mantello, 947 F. Supp. at 99.

The second prong of § 302(a)(1) requires there to be a "articulable nexus between the transacted business and the cause of action on which suit is brought." Newbro, 337 F. Supp. 2d at 431 (internal quotation marks and citations omitted). Thus, "jurisdiction is not justified where the relationship between the claim and transaction is too attenuated." Johnson v. Ward, 4 N.Y.3d 516, 520 (N.Y. 2005).

In addition to satisfying the requirements of § 302(a)(1), the exercise of jurisdiction must also satisfy due process. Due process "requires that a defendant have enough minimum contacts

13

with the forum state so that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" PDK Labs., Inc. v. Friedlander, 103 F.3d 1105, 1110 (2d Cir.1997) (quoting International Shoe v. Washington, 326 U.S. 310, 316 (1945)). Due process is satisfied if the defendant "purposely and sufficiently availed [itself] of the privileges of conducting business in New York, so that it would be reasonable to anticipate being subject to suit in New York." Newbro, 337 F. Supp. 2d at 431; see also Jekyll & Hyde, 150 F. Supp. 2d at 572.

### 1. Polk Theatre Transacted Business in New York

In its motion papers, Polk Theatre relies heavily on Kimco Exchange Place Corp. v. Thomas Benz, Inc., 9 Misc. 3d 1125, 2005 WL 2934280 (N.Y. Sup. Ct. 2005), to support its argument that it is not subject to this court's personal jurisdiction. In Kimco, the New York-based plaintiff, a licensed real estate broker who "conducts business and markets properties . . . on a national basis," entered into two exclusive marketing agreements with the Florida-based defendant, a commercial real estate developer. Id. at *1. Under the agreements, plaintiff was to market and sell five commercial properties – none of which were located in New York – owned by defendant. Plaintiff faxed drafts of the contracts to defendant in Florida, and defendant executed the contracts in Florida and sent them back to New York. Id. Defendant never entered New York to discuss the contracts; rather, he met with plaintiff's representative in Florida. Id. Defendant also made several telephone calls regarding the contracts to plaintiff's New York office. Id. In affirming the Supreme Court's decision that the court lacked personal jurisdiction over defendant, the Appellate Division found that the defendant's "acts of faxing the executed contracts to New York and of making a few telephone calls," were outweighed by the fact that "the plaintiff marketed the defendant['s] properties nationally." Kimco Exchange Place Corp. v.

14

Thomas Benz, Inc., 824 N.Y.S.2d 353, 354 (2d Dep't 2006). Thus, the primary reason the court lacked personal jurisdiction over defendant was because defendant was "not seeking to take advantage of a field particular to New York." Id.

Kimco is distinguishable from the instant scenario precisely because the record indicates that Polk Theatre was "seeking to take advantage of a field particular to New York," namely New York's entertainment industry. Although the Theatre argues that there is "no merit to plaintiff's assertion that defendant specifically was looking for a New York-produced show," the papers submitted to this court suggest otherwise. (Def. Reply Br. at 3.) As proof that she was not looking for a New York-produced show, the Theatre cites only to Ms. Sikora's affidavit statements that she "needed to replace a cancelled show" and she "heard that *On Golden Pond* . . . was touring, so I looked up information on the internet and contacted the company listed by email to inquire about the show." (Sikora Aff. ¶¶ 13-14.) But JFP's website indicates that JFP "specializes in First Class Broadway and touring theatricals," that JFP "work[s] exclusively with the top talent in the industry today," and that JFP itself is located in New York. (JFP Website, Finn Aff., Ex. J.) Moreover, Mr. Finn's affidavit states that *On Golden Pond* "began as a Broadway production that concluded its New York run and then continued as a 'bus and truck' tour. Hence, the entire set and all costumes and props were created in New York for the New York stage." (Finn Aff. ¶ 56.) Although it is unknown whether Ms. Sikora knew that she was contracting to present a traveling version of a Broadway production, the uncontroverted evidence demonstrates that she did just that.

As such, the instant facts resemble the Jekyll & Hyde scenario, much more than the Kimco case. In Jekyll & Hyde, plaintiff played the lead role(s) in the Broadway production of *Jekyll &*

15

*Hyde*. Defendant, a German company, was a theatrical producer that contracted with a third-party New York licensor to produce the Broadway show in Germany. Defendant sought to use plaintiff's image in its marketing and merchandise materials, plaintiff demanded that defendant cease and desist from doing so, and the defendant refused – eventually producing a CD containing the plaintiff's likeness that made its way to New York consumers via defendant's website. Jekyll & Hyde,150 F. Supp. 2d at 568-69. The court found five facts weighed in favor of asserting personal jurisdiction over the German defendant: 1) "the musical's successful Broadway performance certainly affected the desirability to defendant of the license," 2) the defendant "pays royalties to" the third-party New York licensors under the contract, 3) defendant "is subject to the Licensors' supervision," and must obtain "Licensors' approvals" from their artistic consultant, 4) the defendant negotiated the contract with the licensors in New York, and 5) the contract between defendant and the licensors contains a choice of law provision under which the parties submitted to the jurisdiction of New York courts. Id. at 570-71; see also Mantello, 947 F. Supp. at 100 (noting defendant Florida theatre's contract with New York theatrical licensing company to present a Broadway show in Florida "arguably constitute[s] transaction of business in New York").

Three of those five factors are present in the instant case, and the absence of the other two does not change the result of this court's analysis. First, as discussed above, the papers submitted to this court demonstrate that Polk Theatre initiated contact with JFP for the express purpose of presenting a Broadway show that had concluded its New York run, and was continuing as a traveling show. See Courtroom Television Network v. Focus Media, Inc., 695 N.Y.S.2d 17, 19-20 (1st Dep't 1999) ("A non-domiciliary which takes advantage of New York's unique resources

16

in the entertainment industry has purposefully availed itself of the benefits of conducting business in the State"); see also Deutsche Bank Sec., Inc. v. Montana Bd. of Invs., 797 N.Y.S.2d 439, 443 (1st Dep't 2005) (holding personal jurisdiction existed over non-domiciliary defendant in part because defendant "initiated negotiations" with New York plaintiff). The subject matter of the contract is indisputably the presentation of *On Golden Pond*, a show that is – according to Mr. Finn's affidavit – the product of theatre talent and expertise unique to New York. (Finn Aff. ¶¶ 55-56.)

Second, the terms of the Engagement Memorandum clearly state that the Theatre's performance consisted in part of paying all compensation due JFP into its JPMorgan Chase Bank account in New York.[5] (Engagement Memorandum, Finn Aff., Ex. A, at 2.) Since payment for JFP's services was to be received in New York, the Theatre's contention that jurisdiction is lacking because all parties' performance under the contract was to occur in Florida, is manifestly incorrect.

Third, the Engagement Memorandum further requires the Theatre to obtain JFP's approval regarding the Theatre's proposed advertising and marketing campaigns. (Id. at 4.) That approval would have come from New York.

Additionally, although the precise nature of the negotiations that took place between Polk Theatre, Avid, and a New York theatrical union, are not discussed in detail, it is evident that some such discussion took place, which resulted in the New York union's permitting the Theatre to use

---

[5] The court does not now pass on whether this Memorandum was a fully integrated, binding agreement, but rather relies on this signed document for jurisdictional purposes only. Even if, *arguendo*, the Memorandum is not a binding contract, this signed document still signals Polk Theatre's intent to transact business in New York – an action that, coupled with other factors present here, weighs in favor of asserting personal jurisdiction over the Theatre.

17

a cheaper, non-union crew for the show's load-in. Polk Theatre adamantly denies that it directed

Avid to negotiate a modification of the contract between JFP and the union (Pl. Opp. Br. at 7-8),

but the record demonstrates that Ms. Sikora emailed Avid regarding her concern over the cost of a

union crew. (Finn Aff., Ex. E.) She suggested two alternatives (using a non-union crew or

reducing the union cost) (id.), and she emailed Avid on December 27, 2006 and January 4, 2007

requesting "some kind of feedback" regarding her suggestions. (Id.) Finally, her signed January 9,

2007 cover letter – that purportedly included executed copies of the Engagement Agreement –

stated that "Alterations regarding the union section of the contract have been made following

discussions between [Avid] and myself that non-union crew would be acceptable." (Finn Aff.,

Ex. F.) Ms. Sikora does not claim to have negotiated directly with the New York union herself,

but rather discussed the union provision with Avid. It is thus reasonable to conclude that either

JFP or Avid negotiated the change in this Agreement provision for the Theatre's benefit.

Certainly, at this stage of proceedings, where all pleadings and affidavits must be construed in a

light most favorable to plaintiff JFP, Hoffritz, 763 F.2d at 57, it is appropriate for this court to

view the New York union negotiations as conduct occurring in New York and that was directed

by Polk Theatre. Such conduct further supports a finding of personal jurisdiction over Polk

Theatre. See Kimco, 824 N.Y.S. 2d at 354.

Moreover, Polk Theatre is hardly the type of unsophisticated non-domiciliary over whom

New York courts occasionally find personal jurisdiction to be lacking. See, e.g., Deutsche Bank

Sec., Inc. v. Montana Bd. of Invs., 7 N.Y.3d 65, 71-72 (N.Y. 2006) (asserting personal jurisdiction

over defendant governmental agency organized for purpose of investing public funds, and noting

defendant was "distinct from an out-of-state individual investor making a telephone call to a

18

stockbroker in New York"). Rather, Polk Theatre has presented theatrical productions since the 1980s. the Theatre's "primary source of revenue is it[s] performing arts series where the Theatre books approximately six (6) live performances [each season], and Ms. Sikora is "solely responsible for booking shows." (Sikora Aff. ¶¶ 4, 10-11.) It would therefore be inappropriate to view the Theatre as an unsophisticated actor, when it "knowingly initiat[ed] and pursu[ed] a negotiation" with JFP. Deutsche Bank Sec., Inc., 7 N.Y.3d at 71. Indeed, Polk Theatre "was more than a passive buyer of a New York product or service; it played a crucial role in creating the substance of the transaction." Courtroom Television Network, 695 N.Y.S.2d at 19 (internal quotations marks and citations omitted). Given the business Polk Theatre is in, I harbor considerable doubt that this is the first – or only – time it tried to book a show through New York. Further discovery into this issue will no doubt prove enlightening on the issue of whether the Theatre regularly conducts business in New York and is therefore subject to the state's general jurisdiction. I need not resolve that issue today.

Contrary to defendant's argument, the fact that no Polk Theatre representative ever traveled to New York to negotiate the *On Golden Pond* contract – and only communicated with Avid by email, phone and fax – does not deprive this court of personal jurisdiction over the Theatre. Under § 302(a)(1), "proof of one transaction in New York is sufficient to invoke jurisdiction. even though the defendant never enters New York, so long as the defendant's activities here were purposeful." Deutsche Bank Sec., Inc., 7 N.Y.3d at 71; see also Courtroom Television Network, 695 N.Y.S.2d at 19 ("physical presence in the state is not required"). Indeed, "As technological progress has increased the flow of commerce between States, the need for jurisdiction over nonresidents has undergone a similar increase." Deutsche Bank Sec., Inc., 797

19

N.Y.S.2d at 443, since parties can "transact enormous volumes of business within a state without physically entering it." Deutsche Bank Sec., Inc., 7 N.Y.3d at 71. Thus, while electronic communications, telephone calls, faxes or letters, "in and of themselves, are generally not enough to establish jurisdiction, they may be sufficient if used by the defendant deliberately to project itself into business transactions occurring within New York State." Deutsche Bank Sec., Inc., 797 N.Y.S.2d at 443; see also Courtroom Television Network, 695 N.Y.S.2d at 19 ("The requisite contacts may take place by mail or telephone [or] . . . faxes"). As discussed above, Polk Theatre's emails, faxes, and telephone calls accomplished precisely that.

Polk Theatre's remaining argument that it does not have a New York office, owns no property in New York, and maintains no bank accounts in New York – while perhaps true – does not sufficiently outweigh the numerous grounds for asserting personal jurisdiction over the Theatre.

2.  JFP's Claims are Sufficiently Connected to the Business Transacted by Polk Theatre in New York

Whether a sufficient nexus exists between plaintiff JFP's claims and the business transacted by Polk Theatre in New York, merits little discussion. JFP alleges that the Theatre breached the Engagement Agreement and fraudulently misrepresented its actions regarding execution of the Engagement Agreement. (Compl. ¶¶ 24, 27.) These two causes of action are clearly connected to the business transaction at the center of this litigation, namely the negotiation and execution of said contract between Polk Theatre and JFP to present *On Golden Pond* at defendant's theatre. See Hoffritz, 763 F.2d at 60; Linzer, 904 F. Supp. at 214.

20

3. This Court's Personal Jurisdiction over Polk Theatre Comports with Due Process Requirements

New York's long-arm statute, N.Y.C.P.L.R. § 302, "does not extend to the full limits permitted by the Due Process Clause of the Fourteenth Amendment." Jekyll & Hyde, 150 F. Supp. 2d at 572; Newbro, 337 F. Supp. 2d at 434 ("C.P.L.R. § 302 does not reach as far as the constitution permits.") (internal quotation marks and citations omitted). Since this court has already found that asserting personal jurisdiction over Polk Theatre comports with the requirements of § 302(a)(1), it necessarily follows that such jurisdiction also satisfies the Due Process Clause. See Newbro, 337 F. Supp. 2d at 434 ("Ordinarily . . . if jurisdiction is proper under the C.P.L.R., due process will be satisfied") (internal quotation marks and citations omitted).

It is relevant to reiterate that Polk Theatre initiated contact with JFP, a producer of Broadway shows, to discuss the possibility of presenting *On Golden Pond* at its theatre. The Engagement Memorandum required the Theatre to deposit payments into JFP's New York accounts, and further required the Theatre to obtain approval from JFP for all marketing expenses. It also appears that Polk Theatre directed JFP to negotiate with a New York union so that the Theatre could present the show without a union crew. Such purposeful activities in New York constitute "minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice," International Shoe, 326 U.S. at 316, and demonstrate that Polk Theatre "purposefully availed [itself] of the privilege of conducting business in New York and therefore [it] could reasonably anticipate being haled into court in this forum." QRS 10-12(TX), Inc. v. Calcomp Technology, Inc., No. 99-CV-1612, 1999 WL 476448, at *2

(S.D.N.Y. Jul. 8, 1999).

## *B. Motion to Transfer Venue*

Alternatively, defendant Polk Theatre asks this court to transfer this case from the Southern District of New York, to the Middle District of Florida, Tampa Division, where defendant is located. (Def. Br. at 8.)

28 U.S.C. § 1404(a) provides, "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Thus, in order to obtain a transfer of venue, "the moving party bears the burden of establishing 1) that the action is one that 'might have been brought' in the district to which the movant seeks to have it transferred, and 2) that transfer is appropriate based on the convenience of the parties, the convenience of witnesses and the interests of justice." Posven, C.A. v. Liberty Mut. Ins. Co., 303 F. Supp. 2d 391, 400-01 (S.D.N.Y. 2004); see also Reliance Ins. Co. v. Six Star, Inc., 155 F. Supp. 2d 49, 56 (S.D.N.Y. 2001). In determining whether to transfer venue under section 1404(a), "courts employ an individualized, case-by-case consideration of convenience and fairness. Posven, C.A., 303 F. Supp. 2d at 401 (internal quotations marks and citations omitted). This determination lies "within the broad discretion of the courts." Linzer, 904 F. Supp. at 216 (internal quotation marks and citations omitted). Courts should not disturb a plaintiff's choice of forum "'unless the defendants make a clear and convincing showing that the balance of convenience favors defendant['s] choice.'" Id. (quoting Hubbell Inc. v. Pass & Seymour, Inc., 883 F. Supp. 955, 962 (S.D.N.Y. 1995).

Here, plaintiff JFP does not dispute that it could have filed this action in the Middle District of Florida, Tampa Division, because that "transferee court would have had subject matter

22

jurisdiction and personal jurisdiction over" Polk Theatre, and "venue would have been proper in the transferee court." Posven, C.A., 303 F. Supp. 2d at 401.

Therefore, the only question is whether transfer is appropriate based on the balance of convenience to parties and witnesses, and the interests of justice. In balancing the convenience and fairness of a proposed transfer, "courts in this Circuit are guided by the following factors: (1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded to plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based upon the totality of the circumstances." Id. at 404; see also Reliance Ins. Co., 155 F. Supp. 2d at 56-57.

Defendant Polk Theatre's primary argument in support of its § 1404(a) motion to transfer venue is that the Southern District of New York is an improper venue to adjudicate this litigation. In support of this argument, the Theatre cites 28 U.S.C. § 1391's requirement that, in diversity cases, venue lies either 1) where defendant resides, 2) where a substantial part of the events giving rise to the claim occurred, or 3) where "defendant is subject to personal jurisdiction **at the time the action is commenced**." (Def. Br. at 9) (emphasis in original.) According to the Theatre, the first and third options "[c]learly . . . do not apply in this situation," so the only relevant inquiry is "whether a substantial part of the events . . . giving rise to plaintiff's claim occurred in New York." (Id. at 9-10.) The Theatre argues that all such events occurred in the Theatre's hometown of Lakeland, Florida, and New York is therefore an improper venue.

The court is somewhat perplexed by this argument. Although the Theatre moves for

23

transfer only "in the event this court holds that personal jurisdiction over the Polk Theatre is proper" (Def. Br. at 8), it argues in support of this alternative remedy that it "clearly" was not subject to the personal jurisdiction of this court "at the time the action was commenced" and "there can be no question that the Polk Theatre was not subject to personal jurisdiction in New York." (Id. at 9-10.) But this court just decided that this court did (and does) have personal jurisdiction over the Theatre "at the time the action was commenced." Although the Theatre puts this phrase in bold-face twice in its brief, it fails to explain even once why this phrase is significant. The Theatre does not educate this court regarding what events occurred that would explain why personal jurisdiction exists today – which the Theatre concedes in the opening paragraph of its motion for transfer – but not at the time the action was commenced. (Id. at 8.) In the absence of such an explanation, this court restates its earlier holding that defendant Polk Theatre was indeed subject to this court's personal jurisdiction at the time the action commenced, and venue under § 1391 is therefore proper.

The Theatre also contends that transfer is appropriate under § 1404 because the operative facts central to plaintiff JFP's claims occurred largely in Florida. (Def. Br. at 10.) This court disagrees. Both JFP and the Theatre negotiated the terms of the Engagement Memorandum and Agreement via telephone, fax, and email from their respective home states, New York and Florida. Similarly, JFP signed the Engagement Memorandum in New York, and the Theatre signed the Memorandum in Florida. While JFP's performance under the contract (production of *On Golden Pond*) was to occur in Florida, the Theatre's performance (payment for JFP's services) was to occur in New York. And although the only face-to-face meeting between the parties occurred on a single day in Florida, the subject matter of the dispute is the production of a

24

Broadway show whose cast and crew are almost entirely New York-based. I would deem this 'operative facts' analysis a draw, and a draw does not militate in favor of transfer.

The Theatre further argues that transfer is proper because most of the necessary witnesses and documents are located in Florida. But it appears from the pleadings and affidavits that the primary issues in this case will be whether the Engagement Memorandum was binding on either party, and whether Ms. Sikora misrepresented the truth when she informed JFP that she had signed and mailed four copies of the Engagement Agreement. These issues do not appear to be either witness-heavy or document-heavy. Indeed, assuming Ms. Sikora's affidavit to be true, she was the only Polk Theatre employee to speak with either JFP or Avid throughout the contract process, and the Florida-based witnesses thus appear to be few. (Sikora Aff. ¶¶ 11-12, 17-19.) Conversely, Ms. Sikora had contact with at least three different Avid employees in New York during the contract negotiations (Finn Aff., Exs. D-E), and another employee located in Ohio (id., Ex. G); moreover, JFP's president, Mr. Finn, is also located in New York. (Id. ¶ 45.) Even if this court were to permit testimony regarding whether Polk Theatre had the technical capacity to present *On Golden Pond*, such evidence would likely boil down to the competing opinions of JFP and Polk Theatre's technical directors – from the affidavits, it appears that each party employed one such director. (See id., Ex. I.) Thus, the convenience of witnesses - "in many cases . . . the most significant factor in determining whether to transfer venue" - favors keeping the lawsuit in New York. Posven, C.A., 303 F. Supp. 2d at 404.

Defendant Polk Theatre also argues that requiring it – a private, non-profit organization – to defend a lawsuit in New York could cause defendant to become insolvent. (Def. Br. at 10-11; see also Sikora Aff. ¶ 30.) But the Theatre does not explain how its costs will differ based on the

25

venue of the litigation. As noted, Ms. Sikora and perhaps her technical director appear to be the only likely witnesses for the defense. Aside from traveling for the trial, the litigation costs would appear to be approximately the same in either venue.

Last, Polk Theatre argues that New York's choice of law rules support transferring the case to a Florida district court, because plaintiff's claims will likely be governed by Florida law. While this may be true, a "forum's familiarity with the governing law . . . is one of the least important factors in determining a motion to transfer, especially where no complex questions of foreign law are involved." Posven, C.A., 303 F. Supp. 2d at 405; see also Lesser v. Camp Wildwood, No. 01-CV-4209, 2002 WL 1792039 at *6 (S.D.N.Y. 2002). Defendant has not indicated that any complex or novel issues of Florida law are implicated here, nor does it appear likely to this court that plaintiff's causes of action for breach of contract and fraud – two generally well-developed areas of jurisprudence – will raise any such issues. For this reason, the court finds it unnecessary to conduct a choice of law analysis to determine which state law would apply. Even if Florida law applied to JFP's claims, that factor alone would not outweigh the convenience of the witnesses, or the plaintiff's choice of forum, which is typically "given considerable weight" by courts. Posven, 303 F. Supp. 2d at 405; see also Jekyll & Hyde, 150 F. Supp. 2d at 576 n.52 ("deference due the choice of forum by the plaintiff").

## IV. <u>Conclusion</u>

For the foregoing reasons, defendant Polk Theatre's motion to dismiss the complaint for lack of personal jurisdiction or, in the alternative, to transfer venue, is denied.

This constitutes the decision and order of the court.

Dated: July 9, 2007

_____

U.S.D.J.

BY FAX TO ALL COUNSEL

27